# IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

FILED
ASHEVILLE, NC

MAR 17 2026

U.S. DISTRICT COURT
W. DISTRICT OF N.C.

| | |
|---|---|
| WALTER DAVID WITHERELL II | ) |
| | ) |
| *Plaintiff* | ) |
| | ) |
| v. | ) |
| | ) |
| QUILITY INSURANCE HOLDINGS, LLC, | ) |
| SYMMETRY FINANCIAL GROUP, LLC, | ) |
| QUILITY FINANCIAL ADVISORS, LLC, | ) |
| TIM TAYLOR SMITH, | ) |
| LISA KIMBRELL, | ) |
| KYLE KIMBRELL, | ) |
| CRAIG MCMANAMON, | ) |
| CHRIS LEAKE, | ) |
| SIERRA SMITH-SIMONDS, | ) |
| BRETT BEAUDRY, | ) |
| | ) |
| *Defendants.* | ) |

**COMPLAINT**

Case No. 1:26-cv-00082-MOC-WCM

Plaintiff Walter David Witherell II ("Witherell" or "Plaintiff"), complaining of Defendants Quility Insurance Holdings, LLC, Symmetry Financial Group, LLC, Quility Financial Advisors, LLC, Tim Taylor Smith, Lisa Kimbrell, Kyle Kimbrell, Craig McManamon, Chris Leake, Sierra Smith-Simonds, and Brett Beaudry (collectively, "Defendants"), alleges as follows:

1

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ............................................................ ¶¶ 1–9 (pp. 4-6)

**INTRODUCTION** ............................................................................ ¶¶ 10–15 (pp. 7-8)

**PARTIES** ....................................................................................... ¶¶ 16–34 (pp. 8-12)
Corporate Defendants ..................................................................... ¶¶ 18–20 (pp. 8-9)
Individual Defendants ...................................................................... ¶¶ 21–33 (pp. 9–11)
Enterprise Participants and John Does .............................................. ¶ 34 (p. 12)

**JURISDICTION AND VENUE** ...................................................... ¶¶ 35–41 (pp. 12–14)

**FACTUAL ALLEGATIONS**

[Common to All Claims] ................................................................. ¶¶ 42–172 (pp. 14–59)

A. Enterprise Structure, Purpose, and Methods ............................... ¶¶ 42–54 (pp. 14–16)
B. Recruitment and Inducement ..................................................... ¶¶ 55–59 (pp. 17–19)
C. Entry Into the Enterprise ........................................................... ¶¶ 60–63 (pp. 19-20)
D. Operational Reality Following Entry Into the Enterprise ............. ¶¶ 64–70 (pp. 20-22)
E. Unlicensed Activity and Compliance Failures ............................. ¶¶ 71–93 (pp. 22–31)
F. Internal Reporting and Escalation ............................................... ¶¶ 94–99 (pp. 32-33)
G. Hostile/Degrading Conduct at Enterprise Events ........................ ¶¶ 100–132 (pp. 33–42)
H. Coordinated Retaliation Begins ................................................. ¶¶ 133–141 (pp. 42–44)
I. Retaliatory Actions Extended to Plaintiff's Son ........................... ¶¶ 142–151 (pp. 44–47)
J. Termination, Blacklisting, and Economic Exclusion ..................... ¶¶ 152–160 (pp. 47–49)
K. Interstate Commerce and Enterprise Impact................................. ¶¶ 161–172 (pp. 49–59)


**TABLE 1 – Representative RICO Predicate Acts** ........................ ¶¶ 173 (pp. 59–61)

**COUNT I – Federal Civil RICO**

*(18 U.S.C. § 1962(c) – All Defendants)* ......................................... ¶¶ 174–201 (pp. 62–81)

**COUNT II – RICO Conspiracy**

*(18 U.S.C. § 1962(d) – All Defendants)* ......................................... ¶¶ 202–212 (pp. 82–84)

**COUNT III – Fair Labor Standards Act (Misclassification)**

*(29 U.S.C. §§ 201–219)*................................................................. ¶¶ 213–239 (pp. 84–91)

**COUNT IV – Unfair and Deceptive Trade Practices**

*(N.C. Gen. Stat. § 75-1.1 et seq.)* ................................................. ¶¶ 240–244 (pp. 91–92)

Case 1:26-cv-00082-MOC-WCM     Document 1     Filed 03/17/26     Page 2 of 127

**COUNT V – Dodd-Frank Whistleblower Retaliation**

*(15 U.S.C. § 78u-6(h))* ............................................................ ¶¶ 245–266 (pp. 92–97)

**COUNT VI – Tortious Interference with Business Expectancy**......... ¶¶ 267–279 (pp. 98–101)

**COUNT VII – Unjust Enrichment** ...................................................... ¶¶ 280–289 (pp. 101–103)

**COUNT VIII – Civil Conspiracy** ...................................................... ¶¶ 290–298 (pp. 103–105)

**COUNT IX – Fraud and Fraudulent Concealment** ......................... ¶¶ 299–314 (pp. 105–108)

**COUNT X – Aiding and Abetting Breach of Fiduciary Duty** ....... ¶¶ 315–326 (pp. 108–110)

**COUNT XI – Conversion / Misappropriation of Commissions** ..... ¶¶ 327–337 (pp. 110–112)

**COUNT XII – Accounting and Constructive Trust** ......................... ¶¶ 338–350 (pp. 112–115)

**PRAYER FOR RELIEF** ...................................................................... (pp. 115-117)

**EXHIBITS & RELEVANT ATTACHMENTS** ...................................... (pp. 117–125)

**JURY DEMAND** ................................................................................ (p. 127)

**CERTIFICATION** .............................................................................. (p. 127)

3

## PRELIMINARY STATEMENT

1. Plaintiff brings this action to redress a coordinated course of conduct carried out through a nationwide insurance-distribution Enterprise (the "Enterprise") that exercised centralized control over recruitment, training, compliance, compensation, and professional advancement while representing publicly that participants operated independent businesses. The conduct alleged herein is supported by contemporaneous evidence including recorded calls, internal communications, system records, compensation data, and regulatory submissions reflecting Defendants' knowledge, operational control, and response to Plaintiff's protected reporting activity.

2. Plaintiff Walter David Witherell II was recruited into Defendants' Advanced Markets structure as a subject-matter expert ("SME") responsible for training, client development, and revenue-producing engagements. Plaintiff was induced to participate through standardized representations that the Enterprise maintained lawful compliance systems, transparent compensation routing, and professional autonomy. Plaintiff relied on those representations in committing his time, client relationships, and revenue-generating efforts to the Enterprise's platforms and distribution systems. Plaintiff's professional background includes prior service as a police chief, criminal investigator, forensic investigator, and licensed legal/private investigator, in addition to experience in advanced insurance and retirement-income planning and prior securities and advisory licensure.

3. Plaintiff's allegations are supported by contemporaneous records, including recordings, communications, and system data maintained in the ordinary course of business, and are pleaded with specificity to reflect Plaintiff's personal knowledge and preserved documentary evidence. Where allegations are made upon information and belief, they are based on specific documents, recordings, or data within Defendants' possession or control that will be produced in discovery.

4. Despite representing Plaintiff as an independent business owner, Defendants imposed pervasive and uniform Enterprise control over Plaintiff's work, including mandatory systems usage, lead routing, calendar access, reporting hierarchies, disciplinary authority, and compensation pathways. These controls were exercised across state lines through centralized digital platforms and interstate communications, and were integral to Defendants' revenue model.

5. During his tenure, Plaintiff identified and internally reported serious compliance deficiencies, including unlicensed advisory activity, misleading representations to agents and clients, and the systematic suppression of regulatory escalation. Plaintiff's reports were made in good faith and are corroborated by recorded communications and documentary evidence reflecting Defendants' contemporaneous knowledge of the issues raised.

6. After Plaintiff reported compliance and licensing concerns through Enterprise channels, Defendants restricted Plaintiff's access to Enterprise systems, removed calendar and client-access permissions, reassigned or diverted revenue-producing opportunities, and altered commission-routing pathways affecting Plaintiff's income. These actions occurred within a close temporal proximity to Plaintiff's protected reporting activity and resulted in the effective termination of Plaintiff's participation in Enterprise-controlled revenue channels.

7. Defendants' conduct reflects a repeatable operational pattern: when Enterprise participants raise compliance concerns that threaten revenue or expose regulatory risk, Defendants respond by isolating the individual economically, reassigning their work, suppressing escalation, and removing them from Enterprise-controlled systems while retaining the economic benefit of their labor. These actions were not isolated incidents but formed a repeatable method of operation applied to multiple Enterprise participants over time.

5

8. As a direct result of Defendants' alteration of Enterprise-controlled routing, attribution, and access systems, Plaintiff was deprived of compensation attached to structured, client-authorized transactions that had been entered into Enterprise systems and positioned for submission, funding, or carrier issuance at the time Defendants restricted access and reassigned attribution pathways. In multiple instances, Enterprise leadership directed Plaintiff to engage with securities-licensed Enterprise participants, including Defendant Tim Taylor Smith, to facilitate securities-liquidation funding associated with annuity and life-insurance placements, after which Smith and other Enterprise actors interjected themselves into those engagements and exercised control over submission pathways and client communications, preventing or delaying submission while positioning themselves to receive resulting commissions through Enterprise-controlled attribution systems. Plaintiff further suffered deprivation of renewal interests fixed by commission schedules upon placement, interruption of identifiable client engagements, and reputational injury within the financial-services industry. The amounts at issue are traceable through carrier records, commission schedules, and Enterprise system data within Defendants' possession or control.

9. Plaintiff brings this action under federal and state law, including civil remedies for racketeering activity, wage misclassification, whistleblower retaliation, fraud, and related claims, seeking compensatory, statutory, and equitable relief as set forth below.

6

## INTRODUCTION

10. This action arises from Defendants' use of Enterprise-controlled systems and interstate communications to: **(a)** induce Plaintiff into an Advanced Markets role through standardized representations, **(b)** route and control Plaintiff's access to clients, carrier approvals, calendars, and compensation, and **(c)** remove Plaintiff from those income-producing channels after he raised compliance and licensing concerns.

11. Plaintiff's claims arise from three related courses of conduct: **(i)** centralized control over agents and revenue-producing activity presented publicly as independent business ownership; **(ii)** routing and reassignment of client opportunities and commissions through Enterprise-controlled systems; and **(iii)** restrictions on Plaintiff's access to those systems following his internal reporting of compliance concerns.

12. Plaintiff seeks relief under federal and state law, including civil RICO and related claims, to recover diverted commissions and associated business value, to obtain an accounting and constructive trust over identifiable funds, and to prevent further interference through Enterprise-controlled systems.

13. The factual allegations are organized to show: the Enterprise's structure and methods (¶¶ 42–54); the standardized recruitment and onboarding process (¶¶ 55–59); the operational reality of Enterprise control (¶¶ 64–70); the licensing/compliance concerns and internal reporting (¶¶ 71–99); and the retaliatory sequence culminating in constructive termination and industry exclusion (¶¶ 133–160).

14. Plaintiff pleads these claims based on personal knowledge of his own participation in Enterprise operations and on contemporaneous documents, communications, recordings, and system data reflecting Enterprise decision-making and actions affecting Plaintiff. Where

7

allegations are made on information and belief, they are based on records, communications, and events within Defendants' possession or control.

15. This Complaint requests damages and equitable relief to restore diverted compensation, redress interference with identifiable business expectancies, and hold Defendants accountable for coordinated conduct carried out through the Enterprise's platforms and interstate channels.

15A. Plaintiff incorporates prior allegations only to the extent necessary to satisfy the elements of each claim and does not rely on incorporation to create redundancy or ambiguity.

## PARTIES

16. Plaintiff Walter David Witherell II ("Plaintiff" or "Witherell") is a natural person and citizen of the State of Texas, residing in Comal County, Texas, and brings this action against Defendants as set forth herein. Plaintiff is a licensed insurance professional with more than two decades of experience in life insurance, annuity planning, and advanced retirement-income strategies, including Medicare IRMAA mitigation and tax-sensitive planning.

17. During the relevant period, Plaintiff operated within a nationwide insurance-distribution structure controlled by Defendants through centralized training systems, lead-distribution platforms, compliance pathways, and commission-routing mechanisms, upon which Plaintiff was economically dependent for access to clients, scheduling, and compensation.

18. Defendant Quility Insurance Holdings, LLC ("Quility") is a holding company and controlling entity that owns, manages, and profits from affiliated insurance distribution entities operating nationwide, including through centralized technology platforms, marketing systems, and agent-compensation structures. Quility conducts business in North Carolina and throughout the United States.

19. Defendant Symmetry Financial Group, LLC ("Symmetry") is an insurance marketing organization and distribution entity operating under the Quility corporate umbrella, with agents,

8

recruits, and clients located nationwide, including within the State of North Carolina. Symmetry maintained direct control over agent onboarding, lead funnels, training systems, and commission routing relevant to Plaintiff.

20. Defendant Quility Financial Advisors, LLC ("QFA") is an affiliated advisory entity formed and operated as part of the same Enterprise, holding itself out as providing advanced financial and retirement strategies through personnel who interacted directly with Plaintiff's clients and prospects.

21. Defendant Craig McManamon is an individual who, at all relevant times, acted as a senior regional leader and supervisory authority within the Enterprise, exercising control over agents' roles, access to clients, internal communications, and escalation pathways, including those affecting Plaintiff.

22. Defendant Lisa Kimbrell is an individual who, at all relevant times, functioned as an equity-level partner, agency principal, and supervisory authority within the Enterprise, exercising decision-making power over commission allocation, escalation handling, and Enterprise response to internal compliance objections, including matters directly affecting Plaintiff's compensation, access to Enterprise systems, and professional standing.

23. In that role, Defendant Lisa Kimbrell participated in communications and decisions concerning commission allocation, escalation handling, and Enterprise responses to internal compliance concerns, including matters affecting Plaintiff's compensation, access to systems, and professional standing.

24. Defendant Kyle Kimbrell is an individual who, at all relevant times, acted as an Enterprise leader, equity-level partner, and agency principal with authority over recruiting, compensation structures, and strategic Enterprise initiatives relevant to Plaintiff's work and economic interests.

9

25. Defendant Kyle Kimbrell represented to Plaintiff and other agents that they owned their client relationships and could place business independently, while Enterprise approval systems, carrier access, and compensation routing remained controlled through Enterprise platforms.

26. Defendant Tim Taylor Smith is an individual who, at all relevant times, held himself out within the Enterprise as an advanced-markets or retirement specialist and interacted with Plaintiff's clients and prospects in a manner central to the commission diversion and unlicensed activity alleged herein.

27. Publicly available regulatory records maintained by FINRA and the U.S. Securities and Exchange Commission reflect the jurisdictions in which Defendant Tim Taylor Smith was registered or authorized during the relevant period and reflect limitations on his registration status in certain jurisdictions. Plaintiff pleads these records to establish the scope of authorization for client-facing securities-adjacent activity during the time period relevant to the conduct alleged herein.

28. Publicly available FINRA BrokerCheck records for Defendant Smith reflect that he is not currently registered with FINRA, and reflect "0" FINRA registrations and "0" state registrations as reported on the BrokerCheck summary interface for the relevant profile, while separately indicating that Defendant Smith is "currently registered as an investment adviser" and linking to the SEC's Investment Adviser Public Disclosure ("IAPD") system for further information.

29. Publicly available SEC IAPD records for Defendant Smith reflect a limited state registration footprint during the relevant period (including a single state license reflected on the IAPD summary interface), and further reflect state-level regulatory entries concerning the issuance of a restricted license by the State of California, as shown on the IAPD disclosure interface. Plaintiff pleads these regulatory-record facts to distinguish between entity-level

registration and individual authorization to engage in client-facing securities-adjacent communications, and to establish scope-of-authority limitations relevant to the conduct alleged herein.

30. Publicly available regulatory records for Defendant Tim Taylor Smith reflect the jurisdictions in which he was registered or authorized during the relevant period, and the absence of registration or authorization in other jurisdictions in which he participated in Enterprise-directed communications and client-facing activity.

31. Defendant Chris Leake acted at all relevant times in a national leadership and training capacity within the Enterprise, including as a senior figure in advanced-markets strategy, scripting, and agent direction. Leake authored, approved, disseminated, or materially influenced standardized sales scripts, training materials, and Enterprise-approved marketing practices used nationwide, and exercised functional authority over advanced-markets workflows, personnel referrals, and revenue-generating methodologies within the Enterprise.

32. Defendant Sierra Smith-Simonds is an individual who, at all relevant times, acted in a supervisory and administrative capacity within the Enterprise, including participating in adverse actions and communications affecting Plaintiff after protected reporting activity.

33. Defendant Brett Beaudry is an individual who, at all relevant times, acted in a leadership, recruiting, and supervisory capacity within the Enterprise, including inducing Plaintiff to enter the Enterprise by holding himself out as a "Hiring Manager" in Enterprise-approved recruiting advertisements, Zoom meeting confirmations, and email communications; directing recruiting activity; exercising authority over agent onboarding and access to Enterprise-controlled systems; and participating in retaliatory actions following Plaintiff's protected reporting, including the removal and termination of Plaintiff's son from Enterprise-controlled platforms.

11

34.     Defendants John Does 1–20 are individuals and entities whose identities are presently unknown but who participated in, directed, or benefitted from the misconduct alleged herein. Plaintiff will seek leave to amend this Complaint to identify such Defendants when their identities are ascertained.

**JURISDICTION AND VENUE**

35.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under federal law, including 18 U.S.C. §§ 1962(c) and (d), 29 U.S.C. §§ 201–219, and 15 U.S.C. § 78u-6(h). This Court also has jurisdiction under 18 U.S.C. § 1964(c) and 28 U.S.C. § 1965 because Defendants conducted and participated in the affairs of an Enterprise affecting interstate commerce through coordinated use of interstate communications, centralized digital systems, and compensation-routing mechanisms operating in, from, and through this District and elsewhere in North Carolina.

35A.     Defendants transacted and directed Enterprise affairs through interstate wires, digital platforms, and compensation systems affecting agents and clients nationwide. These activities constitute the conduct of an Enterprise affecting interstate commerce within the meaning of 18 U.S.C. §§ 1962 and 1965.

36.     This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367 because those claims arise from the same nucleus of operative facts as the federal claims and form part of the same case or controversy.

37.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because one or more Defendants reside in this District, transact business here, and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in or were directed from this District. Venue is independently proper because Defendants required Plaintiff, as a condition of engagement, to assent to a forum-selection provision designating North Carolina as the exclusive

12

forum for disputes arising from or relating to the parties' relationship. Plaintiff relies on that provision solely to confirm Defendants' own designation of this forum and does not concede the validity, enforceability, classification terms, or independent-contractor characterization contained in any underlying agreement except to the extent Defendants themselves invoked or relied upon it. The provision applies, by its terms, to statutory, tort, racketeering, and retaliation claims. Defendants' recruitment, compensation routing, system controls, and retaliatory decisions were directed from and through this District.

38. Venue is further proper because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, including Enterprise-directed recruiting, mandatory training, compensation routing and diversion decisions, system-access restrictions, and retaliatory actions implemented through Enterprise systems governed from this District.

39. Defendants purposefully availed themselves of this forum by recruiting agents into a North Carolina-centered Enterprise, mandating use of proprietary systems controlled from this District, directing compensation and compliance decisions through personnel operating here, and requiring Plaintiff to litigate disputes exclusively in North Carolina.

40. Defendants' conduct was expressly directed into this District and had foreseeable effects here, including economic harm, diversion of compensation, suppression of compliance escalation, and retaliatory exclusion from Enterprise systems.

41. The exercise of personal jurisdiction over Defendants is consistent with due process because Defendants maintained continuous and systematic contacts with this District, directed Enterprise operations from this forum, and expressly consented by contract to jurisdiction and venue in North Carolina for disputes arising from the parties' relationship.

13

41A. The Enterprise operated through interstate systems and personnel located in multiple jurisdictions, including North Carolina, California, and Washington. The forum-selection clause designating North Carolina is enforceable and does not limit this Court's federal jurisdiction. Venue is proper under 28 U.S.C. §§ 1391 and 1965 because Defendants conducted the affairs of the Enterprise through interstate commerce and directed compensation-routing, system-access, and retaliatory decisions into and from this District.

## FACTUAL ALLEGATIONS

### A. Enterprise Structure, Purpose, and Methods

42. At all relevant times, Defendants operated as an association-in-fact Enterprise within the meaning of 18 U.S.C. § 1961(4), consisting of Quility Insurance Holdings, LLC, Symmetry Financial Group, LLC, Quility Financial Advisors, LLC, the Individual Defendants, and other associated persons and entities whose identities are known to Defendants and will be established through discovery.

43. The Enterprise had a shared and continuing purpose that included: **(a)** generating insurance and annuity revenue through standardized national recruiting funnels marketed as "independent business ownership"; **(b)** retaining centralized control over agent compensation, lead distribution, client attribution, training, and carrier access through Enterprise-controlled systems; **(c)** minimizing regulatory scrutiny by suppressing or deflecting internal compliance escalation; and **(d)** preserving and reallocating revenue streams by diverting commissions, client relationships, and proprietary methodologies away from agents who raised compliance or licensing objections.

44. The Enterprise's suppression of compliance escalation and retaliation against internal dissenters was implemented through Enterprise-controlled authority structures and is reflected in contemporaneous communications and actions described herein. These enforcement practices

14

were integral to maintaining control over income-producing systems and the continuity of Enterprise operations as alleged herein.

45. The Enterprise maintained relationships and longevity sufficient to pursue its purpose, operating continuously across multiple states for years through standardized recruiting materials, national video conferences, centralized CRM and commission platforms, uniform sales scripts, and hierarchical management structures.

46. Although Defendants publicly represented the Enterprise as a decentralized network of independent entrepreneurs, in practice the Enterprise functioned as a centrally directed commercial organization, in which senior leadership exercised unilateral authority over access to clients, calendars, carrier approvals, compensation routing, and professional standing, thereby determining which participants could earn income and which would be economically excluded.

47. Defendants exercised control over Enterprise participants by dictating: **(a)** which leads SME agents could access; **(b)** which products could be sold and how they were presented; **(c)** mandatory training and conference attendance; **(d)** commission routing, attribution, and override allocation; and **(e)** disciplinary and termination decisions, including exclusion from income-generating systems.

48. These control mechanisms were not incidental. They were essential features of the Enterprise's operating model and were enforced through Enterprise-controlled technology platforms, internal communications, and management directives transmitted via interstate wire communications.

49. The Enterprise relied heavily on interstate communications, including email, nationwide Zoom conferences, cloud-based CRM systems, commission portals, recorded training sessions,

15

text messaging, and online recruiting videos, to coordinate operations and maintain uniform practices across state lines.

50. A critical component of the Enterprise's business model involved the mass dissemination of standardized recruiting and marketing representations intended to induce agents to enter the system, invest time and resources, and rely economically on Enterprise-controlled channels for income.

51. These representations included promises of autonomy, ownership, and uncapped earnings, while omitting or obscuring the Enterprise's actual retention of control over agent workflow, client access, compliance escalation, and compensation.

52. The Enterprise further depended on information asymmetry, whereby senior leadership and designated insiders possessed knowledge regarding licensing limitations, regulatory exposure, commission allocation practices, and client ownership policies that were not fully disclosed to participating agents.

53. When Enterprise participants raised concerns that threatened revenue retention, regulatory exposure, or centralized control – including concerns regarding licensing scope, product suitability, commission allocation, or compliance reporting – Defendants responded not through remediation, but through coordinated containment and retaliation, including economic isolation, diversion of income, reputational disparagement, and removal from Enterprise-controlled systems.

54. Plaintiff Witherell's experience within the Enterprise exemplifies this operating model: recruitment through standardized inducements, integration into Enterprise-controlled systems, reliance on Enterprise representations, escalation of compliance concerns, and subsequent coordinated exclusion once those concerns jeopardized Enterprise interests.

16

**B.     Recruitment, Solicitation, and Inducement**

55.     Defendants recruited Plaintiff through a standardized, Enterprise-wide recruitment funnel utilizing interstate communications, including online job postings, promotional videos, scripted presentations, and direct outreach by individuals acting with apparent authority on behalf of the Enterprise. These materials were centrally produced, approved, and disseminated to prospective agents nationwide as part of a uniform inducement strategy. For clarity, Plaintiff alleges that Defendants' recruitment of Plaintiff occurred through Enterprise-authored and Enterprise-controlled solicitation materials, including online job postings and recruiting media designed to induce applications, and not through unsolicited outbound contact; Defendants authored, controlled, and disseminated the representations upon which Plaintiff relied.

> Symmetry Financial Group was ranked #9 of Forbes's top 25 companies with the highest-paying jobs in 2024.
> https://www.forbes.com/sites/rachelwells/2024/07/31/25-companies-hiring-the-most-high-paying-jobs-in-2024/
>
> Symmetry Financial Group is one of the Top Corporate Cultures in America according to Entrepreneur Magazine.
>
> Symmetry Financial Group is One of the Fastest Growing Companies in America for 6 Consecutive Years according to Inc. 5000
>
> WE ARE HIRING!
>
> --Tired of living paycheck to paycheck to make ends meet?
> --Are you ready for freedom and time flexibility?
> --Are you tired of punching someone else's clock? Are you ready to build your own dream?
> --Do you want to work with a team where you're part of the family?

*[Demonstrative Reference Image B-1:* Enterprise recruiting materials and public-facing inducement content illustrating standardized representations disseminated nationwide. Such materials are not offered to establish liability independently, but to corroborate enterprise association, knowledge, opportunity, and state of mind.]

56.     The recruitment materials emphasized "independent business ownership," substantial income potential, flexible scheduling, and access to sophisticated compliance support, while representing that agents would retain autonomy over client relationships, production decisions, and compensation outcomes. These representations were reinforced through

Enterprise-distributed recruiting media and recorded "Corporate Overview" presentations provided to Plaintiff during the March 2025 inducement window, including express claims of "true contractual ownership," the ability to "pass on the business" to a loved one, and eligibility for structured compensation and bonus programs (including "Capital Bonus," "Equity Bonus," "Bird-Dog Bonus," "Producer Bonus," and "Carrier Kickers"), presented as available through advancement within the Enterprise.

57.     These representations were materially false and misleading because Defendants failed to disclose that the Enterprise retained unilateral authority over lead allocation, carrier access, sales scripting, client ownership, calendar placement, and commission routing, such that an agent's ability to earn income depended entirely on continued Enterprise approval rather than independent business discretion.

58.     Defendants further omitted that Enterprise leadership retained unilateral authority to suspend system access, reassign clients, redirect commissions, and terminate agent participation without notice or meaningful review, thereby rendering agents economically dependent upon Enterprise-controlled systems despite the "independent contractor" label.

59.     Plaintiff reasonably relied on Defendants' recruiting representations in deciding to affiliate with the Enterprise, commit professional time and resources, and introduce proprietary client strategies and relationships into Enterprise-controlled systems. Defendants knowingly concealed that such strategies, clients, and income streams could be reassigned or appropriated through internal controls without notice or recourse. These material facts were exclusively within Defendants' knowledge and were not reasonably discoverable through the written agreements or onboarding materials provided.

18

**59A. Predicate Act Micro-Attribution – Fraudulent Recruitment (¶¶ 55–59 | March 2025): Actor(s):** Defendants Beaudry and Craig McManamon (acting with actual and/or apparent Enterprise authority). **Channel:** Recruiting portals, promotional videos, email communications, Zoom recruiting meetings (interstate wires). **Date/Window:** March 2025 (onboarding period and inducement window). **Misrepresentation/Omission:** Independence/autonomy, compensation transparency, compliance infrastructure, and ownership – while omitting Enterprise control over leads, calendars, carrier access, client attribution, and commission routing. **Mechanism:** Enterprise-controlled recruiting funnel and mandatory system onboarding creating economic dependence. **Property Loss:** Plaintiff's introduction of proprietary client strategies/relationships into Enterprise systems and foreseeable loss of identifiable commission opportunities and business value upon later diversion/exclusion as pleaded herein.

**C.     Entry Into the Enterprise**

60.     Plaintiff formally entered the Enterprise after completing onboarding through Enterprise-controlled systems, agreements, and training programs, at which point Defendants exercised immediate and continuing control over the means, manner, and economic realities of Plaintiff's work. Plaintiff executed the governing Enterprise agreements only after exposure to the recruiting representations and Corporate Overview materials described in ¶56, and in reliance on those representations regarding autonomy, compensation structure, and compliance infrastructure.

61.     Upon entry, Plaintiff was required to utilize Enterprise-approved scripts, marketing materials, customer relationship management platforms, calendaring systems, and communication channels, and was further required to submit advanced-markets scripts and materials for Enterprise approval prior to dissemination to agents, and was prohibited from independently modifying or distributing such materials outside Enterprise systems.

62.     Plaintiff's access to clients, carrier appointments, and commission pathways was entirely dependent upon Enterprise discretion and internal routing mechanisms, over which Plaintiff had no independent authority or visibility.

63.     Although Defendants continued to characterize Plaintiff as an "independent contractor," the operational reality of the relationship included centralized control over compensation routing, client access, and system permissions sufficient to render Plaintiff economically dependent on Enterprise-controlled channels for the ability to generate income.

**D.      Operational Reality Following Entry Into the Enterprise**

64.     After becoming operationally integrated, Plaintiff's day-to-day work was governed by Enterprise-enforced workflows dictating prospect intake, product discussion parameters, scheduling approvals, and transaction processing, all monitored and enforced through Enterprise technology platforms.

65.     Enterprise personnel – including regional managers and advanced-markets leaders – possessed the ability to observe, influence, and interpose themselves into Plaintiff's client matters, including by altering transaction structure, reallocating client attribution, or redirecting compensation without Plaintiff's consent.

20



*[**Demonstrative Reference Image D-1:** Internal enterprise hierarchy and scheduling interfaces reflecting centralized oversight and control over agent activity. Such materials are not offered to establish liability independently, but to corroborate enterprise association, knowledge, opportunity, and state of mind.]*

66.     Exiting the Enterprise at this stage would have required Plaintiff to abandon active client pipelines, and forfeit commission opportunities in progress, making economic dependence foreseeable, structural, and not merely incidental.

67.     These conditions existed before Plaintiff engaged in any protected reporting and form part of the factual basis for Plaintiff's claims regarding misclassification, commission diversion, retaliation, and racketeering activity.

68.     As a condition of maintaining his role, visibility, and continued access to income-producing Enterprise systems, Plaintiff was required by Defendants to attend mandatory "Advanced Markets" training events and boot camps designated and controlled by the Enterprise, including the Advanced Markets boot camp held on or about May 27–29, 2025 in Orlando, Florida, at a location selected by the Enterprise, without any discretion afforded to Plaintiff regarding attendance or venue.

21

69.     Defendants required Plaintiff to personally bear all costs associated with mandatory attendance at such Enterprise events, including but not limited to the purchase of an Enterprise-issued ticket, airfare, hotel accommodations, rental car expenses, and related travel costs, without reimbursement or offset, despite Defendants' exclusive control over whether attendance was required and whether Plaintiff would retain access to Enterprise-controlled income channels.

70.     Plaintiff's failure or refusal to attend mandatory Enterprise events would have foreseeably resulted in loss of Enterprise standing, exclusion from advanced-markets participation, and restriction or termination of access to Enterprise-controlled calendars, leads, and compensation pathways, further evidencing Defendants' control over Plaintiff's work, economic dependence, and lack of independent business autonomy.

**E.     Unlicensed Activity and Compliance Failures**

71.     During Plaintiff's participation in the Enterprise, he observed conduct raising serious concerns regarding licensing compliance, regulatory supervision, and the lawful scope of advisory activity conducted under Enterprise control. Plaintiff expressly declined to engage in any securities-adjacent activity outside his licensure and repeatedly redirected such matters to Enterprise-designated personnel in order to maintain regulatory compliance.

71A.    Plaintiff provided similar compliance guidance to Enterprise agent "Jackson" in connection with Louisiana-based clients, advising that insurance-only licensed agents should not facilitate brokerage-account onboarding, investment-profile documentation, or similar securities-adjacent intake processing, and that any such activity must be handled exclusively by appropriately licensed securities personnel, as reflected in contemporaneous communications and actions described herein.

22

72.    Plaintiff observed Defendant Tim Taylor Smith participating in discussions with agents and clients concerning retirement allocations, liquidation of investment assets, and annuity funding strategies involving residents of multiple states, including Arkansas, Louisiana, Colorado, and Alaska, during timeframes when publicly available regulatory records reflected limitations in Smith's registration or licensure footprint in one or more of those jurisdictions.

72A.   On or about June 2, 2025 and June 10, 2025, during Enterprise-directed advanced-markets activity conducted through interstate telephone, Zoom, and electronic communications, Defendant Tim Taylor Smith participated in and directed discussions with an elderly Alaska couple concerning the liquidation of a five-plex rental property producing approximately $8,000–$9,000 per month in income and valued at approximately $540,000 with an approximate cost basis of $500,000. Smith represented, in substance, that the clients possessed a "large capital gain" and should sell the property and reposition the proceeds into annuity and Enterprise-directed managed-asset structures under his control.

72B.   Public regulatory records reviewed contemporaneously by Plaintiff reflected that Smith did not hold active insurance, investment-advisory, or securities licensure in Alaska authorizing the advisory communications and asset-liquidation recommendations described. Plaintiff further observed that the income-replacement projections conveyed were materially misleading because the proposed repositioning of approximately $540,000 could not reasonably generate income comparable to the existing rental stream; at a 2.9%–4% withdrawal range, the repositioned funds would produce approximately $15,000–$22,000 annually, a fraction of the existing rental income.

72C.   These communications were transmitted through interstate wires and Enterprise scheduling systems and were witnessed by Enterprise agent "Rocky," who observed the

23

representations and client-asset-liquidation discussions. Plaintiff thereafter contacted Alaska regulatory authorities to verify licensure status and to express concern regarding the solicitation of Alaska residents by an unlicensed actor. Plaintiff pleads these facts to establish the objective basis for his compliance escalation, the materiality of the representations, and the use of interstate wires in furtherance of a scheme to obtain control over client assets and associated commissions through materially false income-replacement representations and concealment of licensing limitations. Plaintiff pleads these facts based on personal observation and communications to the extent documented.

72D. On or about June 3, 2025, Defendant Tim Taylor Smith instructed Plaintiff during a telephonic call to transmit to Enterprise agent "Rocky" a link and related materials associated with an investment-account intake and document-submission portal for certain Alaska-based clients. At Defendant Smith's direction, Plaintiff sent the requested email and link to Agent Rocky. Plaintiff thereafter advised Agent Rocky that any completion of investment-profile materials or facilitation of brokerage-account onboarding would require appropriately licensed securities personnel. Agent Rocky confirmed that he was insurance-licensed only. Plaintiff expressly declined to participate in or facilitate any securities-related account opening or investment-profile processing and instructed that any such activity must be handled, if at all, by properly licensed individuals. These events and communications are reflected in contemporaneous emails, call records, and related materials described herein.

72E. During a June 2, 2025 advanced-markets meeting involving Louisiana-based clients, Defendant Tim Taylor Smith stated, in substance, "I'm a NASCAR racer," invoking the claimed credential while transitioning into asset-allocation and portfolio-management discussions. Plaintiff was unable to verify the claimed NASCAR credential through publicly available

24

records, just as Plaintiff was unable to verify licensure authorizing the advisory communications being conducted in that jurisdiction. Plaintiff pleads this representation not to dispute personal biography, but to demonstrate the use of unverified authority signaling during interstate advisory discussions material to client reliance.

73. Public regulatory records further reflect that Defendant Smith's registration status and state-licensure footprint were limited during the same timeframe in which he participated in multi-state "Advanced Markets" meetings, calls, and client engagements described herein. Plaintiff relies on those public records to plead an objective basis for his contemporaneous compliance concerns that Defendant Smith was engaging in securities-adjacent or advisory communications affecting residents outside the scope of the state registration reflected on the public IAPD summary interface.

74. During the course of his participation in the Enterprise and before his constructive discharge, Plaintiff sought clarification regarding Defendant Tim Taylor Smith's licensure status from appropriate regulatory authorities responsible for administering insurance and securities licensing requirements. Plaintiff was advised, consistent with publicly available records reviewed contemporaneously by Plaintiff, that Defendant Smith did not hold active licensure authorizing the multi-state insurance, investment-related, or retirement-planning communications described herein in the jurisdictions implicated. Plaintiff pleads these facts to establish his contemporaneous understanding and basis for compliance escalation, not to assert any regulatory finding or conclusion beyond the records reviewed.

25

*[Demonstrative Reference Image E-2:* Client-facing materials and event registration pages reflecting claimed credentials and assets under management. Such materials are not offered to establish liability independently, but to corroborate enterprise association, knowledge, opportunity, and state of mind.]

75. Defendant Smith was routinely presented within the Enterprise as an "Advanced Markets" authority without disclosure to Plaintiff or clients of licensing limitations applicable in multiple states.

76. Plaintiff further observed that Defendant Smith was publicly and internally represented in Enterprise-approved client-facing materials and event registration pages as managing or overseeing "over $400 million in assets," without disclosure of the basis for that figure or any clarifying explanation (e.g., whether the figure referred to firm-wide assets, historical assets, assets merely "in households," non-discretionary assets, brokerage assets, or assets otherwise not reportable as regulatory assets under management). Publicly available regulatory filings or SEC IAPD firm reporting, or both, for Quility Financial Advisors (QFA), the SEC-registered investment adviser entity with which Defendant Smith was affiliated, reflected materially lower firm-wide reported assets under management during the relevant period than the "$400 million" figure represented in Enterprise materials.

77. Public SEC IAPD records for Defendant Smith reflect multiple name variations associated with his regulatory profile, including "Tim Fred Smith," "Tim Taylor Smith," and related permutations, which Plaintiff alleges contributed to information asymmetry and impeded reasonable verification of licensure scope, registration status, and disciplinary history by agents and clients relying on Enterprise representations.

78. Evidence shows that Enterprise-controlled marketing and event platforms disseminated the "$400 million" asset representation as a credentialing/authority signal to induce client trust and agent reliance in advanced-markets engagements, while omitting clarifying disclosures necessary to prevent the representation from misleading reasonable consumers and agents regarding Defendant Smith's actual regulatory scope and authority.

79. Facts demonstrate that Defendants' toleration of these credential/authority representations — combined with multi-state client-facing discussions described in ¶¶ 72–73 — formed part of the compliance failures Plaintiff escalated internally, and further supports Plaintiff's allegations of concealment, inducement, and suppression of escalation to protect revenue streams.

80. These multi-state activities occurred within Enterprise-directed meetings, recorded calls, and coordinated client engagements conducted through Enterprise platforms and scheduling systems, and were permitted to proceed without disclosure, restriction, or compliance intervention, despite Defendants' contemporaneous knowledge of licensing limitations and regulatory risk.

81. These representations regarding assets under management were disseminated through Enterprise-controlled marketing channels, event platforms, and training-adjacent materials without accompanying compliance clarification, limitation, or corrective disclosure, a deliberate

27

omission given Defendants' contemporaneous access to regulatory filings governing permissible advertising, licensure scope, and asset-management representations.

82. The absence of disclosure described above was not inferred or speculative. Plaintiff's understanding was based on contemporaneous review of publicly available regulatory records, including SEC IAPD and Form ADV filings, and publicly accessible licensure databases, which were available to Defendants at all relevant times and which reflected materially different asset and registration information than that presented in Enterprise-approved materials. Evidence shows no facts beyond those reflected in such public records and Enterprise-controlled representations.

83. During the same period, Plaintiff received written communications, including text messages from other Enterprise-designated subject matter experts expressing concern regarding the presentation of elevated or aggressive illustration figures to clients and the outputs generated by Enterprise-endorsed debt-elimination and financial modeling software. These communications reflected contemporaneous internal concern regarding the reliability, suitability, and regulatory risk of such representations. Plaintiff pleads these communications to establish the contemporaneous existence of internal concern within the Enterprise regarding the reliability and compliance sensitivity of certain illustration outputs and marketing representations, and to show the context in which Plaintiff escalated compliance concerns.

84. Plaintiff reasonably believed that continued participation in Enterprise-directed activity without escalation would expose him personally to regulatory enforcement, licensure discipline, and professional liability for conduct occurring under Defendants' control but beyond Plaintiff's lawful scope of authority.

28

85. During Plaintiff's participation in the Enterprise, Defendants disseminated and required the use of standardized, Enterprise-approved mortgage-protection marketing materials, including mailers transmitted through the United States mail and interstate delivery services labeled or styled as "FINAL NOTICE," "IMPORTANT NOTICE," or substantially similar urgent or official-appearing communications, designed to induce consumer response through fear, confusion, or misrepresentation of purpose.

86. These mortgage-protection materials were not independently created by individual agents but were centrally approved, promoted, and distributed through Enterprise training channels, internal portals, and leadership directives, including scripted language and presentation instructions used nationwide. Upon information and belief, the Enterprise and its parent entities were previously the subject of regulatory scrutiny, including a 2016 Cease and Desist Order issued by the Illinois Department of Financial and Professional Regulation against Symmetry Financial Group, LLC concerning mortgage protection marketing practices. Public reporting regarding that action, including a June 26, 2018 investigative report by KCRG-TV9, further placed Enterprise leadership on notice of regulatory compliance concerns relating to marketing representations and consumer disclosures. Despite such notice, the Enterprise continued to employ materially similar marketing and recruitment structures.

87. Defendant Chris Leake authored, disseminated, or materially contributed to standardized mortgage-protection scripts and training directives used by Enterprise agents, including language instructing agents on how to frame consumer interactions following receipt of such mailers and how to transition consumers into insurance or annuity sales discussions.

88. During Plaintiff's participation in the Enterprise, Defendant Chris Leake engaged in extensive direct telephonic and electronic communications with Plaintiff, during which Plaintiff

29

explained and applied IRMAA ("Income Related Monthly Adjustment Amount") mitigation strategies, advanced retirement-income structuring concepts, and compliance-sensitive planning methodologies developed through Plaintiff's professional experience, under express representations that Plaintiff would be compensated, integrated into Enterprise wealth-management operations, and provided client opportunities in exchange for that expertise.

89. Following these communications, Plaintiff was excluded from Enterprise-controlled revenue pathways while Defendants retained, operationalized, and deployed the methodologies discussed through national training calls, standardized scripts, and Enterprise sales materials, including representations that Defendant Leake intended to disseminate such strategies for use by agents nationwide. Defendant Leake further expressed his intent to disseminate such strategies throughout the Enterprise's nationwide agent network and, upon refinement, to market and sell such strategies to outside financial professionals across multiple states, thereby expanding the Enterprise's revenue footprint through standardized deployment.

90. Plaintiff personally observed the Enterprise-wide dissemination and required use of these "mortgage protection" scripts and mailers through national training calls, internal message channels, and Enterprise-approved sales materials, and reasonably believed that such practices exposed agents and consumers to regulatory risk, including deceptive trade practices and mail-based inducement violations.

91. Plaintiff reasonably understood that the inflation or mischaracterization of advisory authority and assets under management, when combined with interstate solicitation and unlicensed advisory discussions, created heightened regulatory exposure for participating agents and clients, and formed part of the broader compliance concerns Plaintiff later escalated internally.

30

92. The Enterprise did not provide meaningful compliance review, corrective instruction, or licensing-scope guidance concerning the use of these mortgage-protection materials, despite their standardized nature and widespread use across multiple states through interstate mail and wire communications.

93. Plaintiff's observations regarding the Enterprise-approved mortgage-protection scripts and mailers formed part of the broader compliance concerns he later escalated internally, including concerns regarding misrepresentation, licensing scope, consumer deception, and Enterprise tolerance of revenue-generating practices that prioritized sales volume over regulatory compliance.

93A. **Predicate Act Micro-Attribution – Deceptive Mortgage-Protection Mail Funnel (¶¶ 85–93 | March–June 2025): Actor(s):** Defendant Leake (authoring/approving scripts), Defendant McManamon (leadership dissemination/authorization), Enterprise leadership and Corporate Defendants (systemwide approval and enforcement). **Channel:** United States mail and interstate delivery services (mail), plus training calls/portals (wire). **Date/Window:** March–June 2025. **Misrepresentation/Omission:** "Final notice/urgent/official-appearing" communications and standardized scripts designed to induce consumer response through confusion or misrepresentation of purpose. **Mechanism:** Enterprise-approved mass mail funnel and scripting directives deployed nationally through Enterprise systems. **Property Loss:** Enterprise revenue generated through consumer inducement and downstream sales; Plaintiff's loss of commissions and identifiable business opportunities when Enterprise control later rerouted/withheld compensation as pleaded.

## F.   Internal Reporting and Escalation

94.   Beginning in or about early May 2025, and continuing into early June 2025, Plaintiff internally escalated concerns regarding unlicensed advisory activity, suitability risks, carrier solvency exposure, and commission diversion through channels expressly represented by Defendants as appropriate for compliance reporting, including direct communications with Enterprise leadership possessing authority to investigate, remediate, or halt the conduct at issue.

95.   Plaintiff's reports were made in good faith through channels expressly represented by Defendants as appropriate for addressing compliance, licensing, and compensation concerns.

96.   Rather than initiate corrective review, restrict the conduct at issue, or provide compliance guidance, Defendants responded to Plaintiff's reports by discouraging further inquiry, redirecting responsibility away from Enterprise leadership, and maintaining existing operational practices while retaining exclusive control over the systems, personnel, and revenue streams implicated by Plaintiff's reports.

97.   On or about May 5, 2025, Plaintiff participated in a three-way telephonic call with Defendants Brett Beaudry and Craig McManamon during which Defendants demanded explanations for delayed commission overrides on annuity and life-insurance transactions; Plaintiff responded that the majority of Enterprise-referred prospects held federal securities and that regulatory rules prohibit general-lines insurance agents from providing investment advice or directing securities liquidation to fund insurance products, requiring the involvement of a properly licensed securities professional – concerns Defendants acknowledged when recruiting Plaintiff and that prompted Defendant McManamon to refer Plaintiff to Defendant Chris Leake for further handling within the Enterprise.

32

98. During that same call, Plaintiff reiterated concerns regarding product suitability and carrier solvency, explaining that several Enterprise-approved insurance and annuity products carried materially low solvency ratings inconsistent with prudent placement of client assets. Plaintiff requested access to more financially solvent carriers, including carriers paying lower commissions, in order to mitigate regulatory exposure and protect client interests.

99. In response, Defendant McManamon advised Plaintiff that he would be referred to Defendant Chris Leake, who McManamon identified as responsible for advanced-markets and securities-adjacent coordination within the Enterprise. Plaintiff was subsequently directed into communications involving Defendant Tim Taylor Smith, an individual operating within Leake's direct revenue and supervisory sphere, whose licensing status and conduct later became the subject of Plaintiff's compliance concerns.

**G. Hostile and Degrading Conduct at Enterprise Events; Suppression of Commission-Diversion Escalation.**

100. On or about May 29, 2025, at the Advanced Markets boot camp held in Orlando, Florida, while Plaintiff was circulating at Enterprise direction to explain and illustrate advanced financial-planning concepts for agency owners, SMEs, equity partners, and Enterprise agents, a female agency owner loudly directed a sexually explicit remark toward Plaintiff in the presence of multiple Enterprise participants, including Defendant McManamon.

101. Plaintiff did not solicit or invite the remark, disengaged, and left the area. During the same boot camp, Defendant Tim Taylor Smith appeared without prior coordination and requested to stay overnight in Plaintiff's hotel room, proposing to "sleep on the floor," causing Plaintiff to incur additional personal expense to secure alternate sleeping arrangements.

33

102. Defendant McManamon, who had supervisory authority at the event and observed the sexually explicit remark, took no corrective action and did not follow up with Plaintiff, signaling tolerance of the conduct within Enterprise-sponsored activity.

103. During the same May 29, 2025 Orlando boot camp, Defendant Tim Taylor Smith, despite lacking required life insurance or securities licensure in the State of Arkansas, directly solicited Plaintiff's largest client engagement and induced the client to open and fund a Charles Schwab brokerage account with approximately $275,000. This conduct is memorialized in a contemporaneous audio recording in Plaintiff's possession and resulted in the redirection of Plaintiff's largest client opportunity and immediate economic loss associated with that engagement.

104. Evidence shows this solicitation and account-opening inducement occurred through Enterprise-directed authority and scheduling access, and involved securities-adjacent conduct outside the scope of the limited state licensure footprint reflected on Defendant Smith's public regulatory summary interface.

104A. **Predicate Act – Unlicensed Securities Facilitation (18 U.S.C. § 1343). Actor:** Defendant Tim Taylor Smith. **Channel:** Electronic communications and brokerage coordination. **Date:** On or about early June 2025. **Misrepresentation and Conduct:** Smith solicited a client to utilize a Charles Schwab brokerage account to fund an "infinite banking" life insurance structure and, through contemporaneous email communications, directed Enterprise-associated agent Jason Shorrock (insurance licensed only) to facilitate the opening of the brokerage account. Upon confirmation, Shorrock acknowledged that he held only an insurance license. These coordinated actions resulted in the initiation of securities-related transactions without proper registered licensure, while Plaintiff objected on compliance grounds. **Mechanism:** Enterprise-controlled

34

recruiting funnel and mandatory system commission routing. **Property Loss:** Plaintiff's introduction of proprietary client strategies/relationships into Enterprise systems and foreseeable loss of identifiable commission opportunities and business value upon later diversion/exclusion as pleaded herein.

105. On or about June 10, 2025, during a nationwide Zoom sales meeting attended by Enterprise agents, Defendant McManamon addressed advanced-markets scheduling and appointment re-direction in a manner that minimized Plaintiff's previously escalated compliance concerns and reframed them as administrative or "commission" issues.

106. During the meeting, Defendant McManamon minimized Plaintiff's concerns as "commission confusion" (or similar phrasing) and instructed Enterprise participants that clients and appointments could be placed on calendars other than Plaintiff's, despite Plaintiff being the designated SME, and only SME in attendance when these statements were made.

107. Facts demonstrate that these statements functioned as Enterprise authorization for participants to bypass Plaintiff as the designated Subject Matter Expert, resulting in the re-routing of income-producing appointments, client access, and commission opportunities away from Plaintiff through Enterprise-controlled scheduling and referral systems.

107A. **Predicate Act Micro-Attribution – Income-Pipeline Sabotage via Nationwide Zoom (¶¶105–107 | June 10, 2025): Actor(s):** Defendant McManamon (national leadership authority). **Channel:** Nationwide Zoom sales meeting (interstate wire). **Date/Window:** June 10, 2025. **Misrepresentation/Omission:** Minimizing Plaintiff's escalated compliance concerns as "commission confusion" while authorizing bypass of Plaintiff as SME. **Mechanism:** Enterprise calendar/scheduling re-routing and referral authorization through Enterprise-controlled systems.

**Property Loss:** Loss of SME appointments, diverted commissions, and measurable dismantling of Plaintiff's income pipeline as pleaded.

108. On or about June 13, 2025, Defendant Sierra Smith-Simonds scheduled a Zoom meeting attended by Defendant Beaudry after Plaintiff had already been removed from Enterprise-controlled referral pathways and could no longer be located within the Enterprise calendar/referral system, as communicated to Plaintiff by an Enterprise agent via text.

109. Plaintiff alleges the June 13 meeting functioned as a termination or separation meeting and occurred after adverse system actions had already been implemented. During the meeting, Enterprise leadership shifted its posture once the scope of Plaintiff's compliance and licensure objections became apparent, consistent with containment rather than remediation. During the June 13, 2025 recorded termination meeting scheduled by Defendant Sierra Smith-Simonds and attended by Defendant Brett Beaudry, Smith-Simonds acknowledged that Plaintiff's referral number would be "turned back on," corroborating contemporaneous text communications from an Enterprise agent earlier that morning indicating Plaintiff's referral number had been disabled in the system. At the time of this meeting, Beaudry had been previously informed, during a June 6, 2025 conference call with Defendant McManamon, of Plaintiff's objections to unlicensed securities activity and compliance concerns regarding Defendant Smith's licensure status.

110. At an Enterprise dinner event on or about May 29, 2025, Defendant Kyle Kimbrell stated to Plaintiff that agents "own their own businesses" and "own their clients," and that agents could obtain contracts elsewhere if Enterprise products were unsuitable.

111. Plaintiff alleges these representations were contradicted by Enterprise conduct that followed, including restrictions on carrier access, client routing, calendar placement, and commission attribution imposed through Enterprise systems after Plaintiff escalated concerns.

36

112. On or about June 19, 2025, Defendant Lisa Kimbrell participated in a recorded telephonic communication with Plaintiff concerning commission diversion and escalation.

113. Plaintiff reiterated his compliance objections regarding unlicensed securities solicitation and improper asset liquidation practices, expressly refusing to participate in conduct he believed violated federal and state securities laws.

114. Plaintiff declined to abandon his protected activity by accepting informal remediation, and alleges the call reflects Defendants' contemporaneous awareness of misconduct and an intent to contain exposure through inducement and discouragement of external reporting.

114A. On June 19, 2025, during a recorded interstate telephone call, Defendant Lisa Kimbrell urged Plaintiff not to escalate compliance concerns or communicate with external authorities and attempted to induce Plaintiff to remain silent while Enterprise leadership addressed the matter internally. At the time of this communication, Defendants were aware that Plaintiff had reported or was preparing to report the underlying conduct to federal regulators, including the Securities and Exchange Commission, at a time when a federal agency proceeding was reasonably foreseeable and within Defendants' contemplation. Defendants' conduct constituted a knowing endeavor to influence, obstruct, or impede a reasonably foreseeable federal proceeding by discouraging reporting and attempting to secure Plaintiff's silence while Enterprise-controlled compensation diversion and exclusion continued, resulting in continued loss of identifiable commissions and business value.

115. Facts demonstrate that, shortly after this call, Defendants continued Enterprise actions restricting Plaintiff's access to income-producing systems and opportunities, reinforcing the retaliatory sequence and confirming Plaintiff's exclusion from Enterprise-controlled income-producing systems.

37



***Reference Images G-1, G-2:*** Social media images depicting Defendants Craig McManamon (left image, seated at table holding a beverage) and Defendants Kyle Kimbrell, Chris Leake, Lisa Kimbrell, and Sierra Smith-Simonds (right image, swimming-pool setting) Plaintiff alleges only what is visibly depicted and temporally relevant: that senior Enterprise leadership and implicated Defendants were present together at a resort location within days of Plaintiff's protected disclosures and contemporaneous adverse actions, a fact pleaded solely to establish timing, coordination, and opportunity. Such materials are not offered to establish liability independently, but to corroborate enterprise association, knowledge, opportunity, and state of mind.

116. On or about June 19, 2025 at approximately 9:38 p.m., Plaintiff received a text message from Defendant Kyle Kimbrell stating, in substance: "Brother Walter, I am really sorry to hear what I heard today. Lisa and I are for you. I'll be in touch." Defendant Kyle Kimbrell thereafter provided no follow-up communication to Plaintiff despite Plaintiff's ongoing escalation of compliance and commission-diversion concerns.

117. On or about June 27, 2025 – approximately eight days after the June 19, 2025 recorded call described in ¶¶ 112–114 – Plaintiff obtained and preserved two contemporaneous social-media images depicting Enterprise leadership together at a resort location in Mexico, as reflected by the timestamp and interface metadata visible on the images (see EXHIBIT 30).

118. One image depicts Defendant Craig McManamon seated at a table holding a beverage, while a second image depicts Defendants Kyle Kimbrell, Chris Leake, Lisa Kimbrell, and Sierra

Smith-Simonds together in a swimming pool area at the same location, with Defendant Sierra Smith-Simonds visible in the background wearing a brown top. Plaintiff pleads only what is visibly depicted in the images and does not allege any facts beyond what the images themselves show.

119. Plaintiff alleges these images are relevant to timing and contemporaneous association: during the same period Defendants represented concern to Plaintiff and suggested informal remediation or follow-up regarding Plaintiff's escalated compliance concerns, Defendants were contemporaneously appearing together in normal course association while Plaintiff received no follow-up communication and instead experienced continued restriction of access to Enterprise-controlled systems, followed by adverse carrier-appointment actions.

120. These facts are pleaded solely to establish timing, coordination, and opportunity in relation to Defendants' subsequent decisions affecting Plaintiff's access to Enterprise-controlled systems and carrier relationships, and not to assert moral judgment.

121. After Plaintiff's constructive discharge and removal from Enterprise-controlled systems, Plaintiff learned that Defendant McManamon communicated to Enterprise agents that Plaintiff falsely stated a stolen-luggage incident to avoid Enterprise responsibilities.

122. Plaintiff alleges this statement was false and that Plaintiff filed a contemporaneous police report documenting the theft of his luggage. When contacted by an Enterprise agent who questioned the statement after hearing it repeated within Enterprise channels, Plaintiff produced the police report documentation. The report, bearing an official report number and officer identification, is attached as an exhibit under seal.

123. Plaintiff alleges Defendant McManamon's statements were disseminated to multiple agents nationally and were accompanied by directives or encouragement to avoid placing clients

39

or agents on Plaintiff's calendar due to purported "commission issues," despite Enterprise leadership having already restricted Plaintiff's calendar/referral access.

124. Plaintiff alleges these communications operated to damage Plaintiff's professional standing, interfere with existing and prospective business relationships, and function as a de facto blacklist within Enterprise-controlled channels. Plaintiff was the only designated Advanced Markets Subject Matter Expert ("SME") present during the nationwide meeting in which Defendant McManamon disparaged Plaintiff's competence and business practices, and the disparagement was transmitted to Enterprise agents across multiple states.

125. On or about June 6, 2025, Plaintiff participated in a telephone call with Defendants Brett Beaudry and Craig McManamon during which Plaintiff raised Defendant Tim Taylor Smith's lack of required insurance licensure in multiple states as the reason certain annuity and life-insurance transactions could not lawfully proceed, and reiterated concerns previously expressed regarding carrier solvency and product suitability.

126. During that call, Plaintiff requested access to more financially solvent insurance carriers, including carriers that paid lower commissions but presented reduced risk to clients and to Plaintiff in light of regulatory, suitability, and fiduciary considerations.

127. Defendant McManamon responded that the Enterprise-approved carriers were "good," asserted that such carriers held acceptable ratings, and stated in substance that concerns regarding carrier solvencies were mitigated by agent-purchased errors-and-omissions coverage, dismissing Plaintiff's reliance on forensic accounting analysis and actuarial solvency data including heightened risk to client assets.

128. Despite these representations, Defendants denied Plaintiff access to alternative, more solvent carriers that paid lower commissions thereby intentionally limiting Plaintiff's ability to

offer a broader range of suitable products and mitigate client risk, and approximately one week later Defendant Beaudry informed Plaintiff that such carriers would not be approved without explanation, stating in substance that "the Enterprise said no," after which Defendants enforced Enterprise controls to exclude Plaintiff from clients, calendars, and compensation.

129. After Plaintiff's constructive discharge and refusal to participate in conduct he reasonably believed to be unlawful, misleading to consumers, or professionally jeopardizing, Plaintiff learned that Defendant Craig McManamon initiated a separate course of retaliatory disparagement directed at Enterprise agents, distinct from the system restrictions already imposed, and intended to rationalize Plaintiff's exclusion after the fact.

130. The statements attributed to Defendant McManamon were false and known by him to be false at the time they were made; Plaintiff had filed a contemporaneous police report documenting the luggage theft, which Plaintiff later produced to a separate Enterprise agent who independently contacted Plaintiff to verify the accuracy of the circulated statements.

131. Plaintiff was informed by that Enterprise agent that Defendant McManamon repeated these false statements broadly to multiple agents and coupled them with guidance discouraging calendar placement, referrals, or client engagement with Plaintiff, thereby transforming isolated disparagement into an Enterprise-wide signal regarding Plaintiff's professional standing.

132. This retaliatory disparagement occurred after Plaintiff's constructive discharge, was unrelated to any legitimate performance concern, and independently operated to damage Plaintiff's reputation, interfere with existing and prospective business relationships, and reinforce Plaintiff's exclusion from income-producing opportunities, resulting in reputational harm, loss of business expectancy, and measurable economic injury separate from the underlying termination. This transition marked the point at which Defendants' conduct shifted from passive tolerance of

41

misconduct to active, coordinated retaliation designed to suppress protected reporting and preserve Enterprise revenue.

**H.      Coordinated Retaliation Begins**

133.    Contemporaneous with Plaintiff's protected escalation of licensing, suitability, and commission-diversion concerns, Defendants initiated a coordinated course of retaliatory action intended to isolate Plaintiff economically, disrupt his income, and remove him from Enterprise-controlled operations.

134.    These retaliatory actions began within days of Plaintiff's protected reporting and marked a sharp departure from Defendants' prior treatment of Plaintiff, who had previously been positioned as a trusted producer and subject-matter resource within the Enterprise. Defendant Tim Taylor Smith stated, in substance, that prior to Plaintiff securing the high-net-worth "Mack" client and salvaging two additional substantial cases, certain Enterprise leadership "did not even know who [he] was," and that Plaintiff's actions had effectively made Smith and others "instant celebrities" within the organization – an admission evidencing Plaintiff's material contribution to Enterprise revenue and visibility immediately preceding the retaliatory sequence.

135.    Plaintiff was abruptly excluded from internal communications essential to his work, including Enterprise messaging channels, scheduling systems, and collaboration platforms required for client servicing, lead access, and participation in Enterprise-directed activity.

42



*[Demonstrative Reference Images H-1-H-3:* Enterprise communication platforms reflecting Plaintiff's removal or access restriction following protected activity. Such materials are not offered to establish liability independently, but to corroborate enterprise association, knowledge, opportunity, and state of mind.]

136. Plaintiff was removed from previously scheduled meetings, planning sessions, and client-related discussions without explanation, despite ongoing matters for which Plaintiff remained responsible and financially exposed.

137. Defendants restricted Plaintiff's access to Enterprise-controlled systems governing carrier interfaces, calendaring, and commission tracking, materially impairing Plaintiff's ability to generate income and signaling to other Enterprise participants that Plaintiff was no longer authorized or supported.

138. During this same period, Defendant Craig McManamon reinforced the retaliatory campaign by disseminating false statements through Enterprise-controlled channels, including false statements repeated by McManamon, who expressly attributed those statements to Defendant Tim Taylor Smith, falsely asserting that Plaintiff lacked securities-related financial advisory materials on his laptop computer and was unprepared.

139. Concurrently, Defendants intensified scrutiny of Plaintiff's conduct while ignoring or minimizing the licensing, compliance, and suitability violations Plaintiff had reported, creating a one-sided enforcement environment directed exclusively at Plaintiff.

140. The temporal proximity, sequencing, and uniformity of Defendants' adverse actions – spanning system access, compensation pathways, communications, and reputational standing – established a causal connection between Plaintiff's protected compliance and whistleblower activity and the retaliatory conduct imposed.

141. These actions were not isolated or accidental, but occurred across multiple functional areas of the Enterprise – including management, technology access, compensation pathways, and communications – reflecting coordinated decision-making rather than independent or discretionary responses.

141A. **Predicate Act Micro-Attribution – Retaliatory System Exclusion (¶¶ 133–141 | June–July 2025): Actor(s):** Defendants Leake, McManamon, Smith-Simonds, Beaudry (and other Enterprise decision-makers). **Channel:** Enterprise platforms (CRM, calendars, portals), messaging applications, Zoom/telephony (interstate wires). **Date/Window:** June–July 2025. **Misrepresentation/Omission:** Pretextual framing and/or concealment of the true retaliatory basis for lockouts and exclusion. **Mechanism:** System lockouts, calendar removals, channel exclusion, carrier/approval interference. **Property Loss:** Immediate loss of access to income-producing channels and identifiable commissions/renewals traceable through carrier and Enterprise routing records, as pleaded.

## I. Retaliatory Actions Extended to Plaintiff's Son

142. As part of the same coordinated retaliatory course of conduct described above, Defendants extended adverse actions beyond Plaintiff himself to include Plaintiff's immediate

family member – his son – who had been recruited into the Enterprise at Defendants' direction and with Defendants' encouragement. The Enterprise alleged herein operated through coordinated decision-making and shared systems distinct from any individual Defendant acting alone.

143. Plaintiff's son, a United States military veteran rated one hundred percent (100%) disabled, was recruited into the Enterprise after Defendant Brett Beaudry and others requested that Plaintiff recruit prospective agents, including individuals personally known to him.

144. In reliance on Defendants' recruiting representations and at Defendants' urging, Plaintiff's son expended personal funds, completed licensing requirements, undertook onboarding, and devoted substantial time studying Enterprise-approved training materials, including standardized scripting and sales directives attributed to Defendant Chris Leake.

145. Plaintiff's son was integrated into Enterprise-controlled platforms and communication channels and reasonably expected to begin producing business through Defendants' systems in the same manner represented to other newly recruited agents.

146. Shortly after Plaintiff escalated compliance concerns and engaged in protected reporting activity, Defendant Brett Beaudry removed Plaintiff's son from Enterprise-utilized platforms and access channels without warning, explanation, or performance-based justification, effectively terminating his participation before he had the opportunity to generate income.

147. Plaintiff's son was provided no notice of any alleged deficiency, no corrective opportunity, and no legitimate business reason for his removal, and contemporaneous communications reflect confusion and distress regarding the abrupt exclusion.

148. The timing, manner, and target of this action against Plaintiff's son support the inference that the removal of Plaintiff's son occurred shortly after Plaintiff's protected reporting activity

45

and formed part of the same sequence of adverse actions affecting Plaintiff. The termination of Plaintiff's son also served to reinforce Enterprise discipline by demonstrating that compliance escalation would result not only in professional consequences, but personal economic harm extending beyond the reporting individual.

149. The timing, sequencing, and scope of the actions described in ¶¶ 133–148 support a reasonable inference that Defendants' conduct was undertaken to contain the effects of Plaintiff's compliance and whistleblower activity and to preserve Enterprise control over revenue-producing systems. The removal of Plaintiff and his son from Enterprise platforms occurred within days of Plaintiff's protected reporting and followed the escalation communications described herein. Plaintiff pleads these facts to establish the objective basis for the retaliatory inference and resulting economic harm, not to speculate as to subjective motives beyond the contemporaneous communications and actions described.

150. The timing, scope, and uniformity of Defendants' actions demonstrate that the Enterprise shifted from treating Plaintiff as a valued participant to treating him as a liability following his protected disclosures.

151. As a direct result of Defendants' coordinated retaliation, Plaintiff's working conditions became untenable, his income streams were disrupted, causing Plaintiff immediate economic harm, loss of income, and professional displacement.

151A. **Predicate Act Micro-Attribution – Retaliation Against Plaintiff's Son (¶¶ 142–151 | June–July 2025): Actor(s):** Defendant Beaudry (implementing) with Enterprise authority and ratification by Enterprise leadership as pleaded. **Channel:** Enterprise onboarding/access platforms and communication channels (interstate wires). **Date/Window:** June–July 2025. **Misrepresentation/Omission:** Removal without legitimate performance basis and without stated

reason, shortly after Plaintiff's protected activity. **Mechanism:** Administrative lockout/termination from Enterprise systems. **Property Loss:** Foreclosed commissions and economic opportunity of Plaintiff's son; additional punitive/economic pressure inflicted on Plaintiff to deter whistleblowing, as pleaded.

### J. Termination, Blacklisting, and Economic Exclusion

152. The retaliatory conduct described above did not occur in isolation. It escalated in a deliberate and foreseeable sequence – from system restriction, to economic isolation, to termination – each step compounding the prior harm and rendering Plaintiff's continued participation in the Enterprise impossible.

153. Defendants did not identify any legitimate performance-based reason for Plaintiff's removal. Prior to his protected activity, Plaintiff had been actively engaged in revenue-generating work, assigned advanced-markets responsibilities, regularly featured in enterprise-sponsored programming – including a recurring "Wealth with Walter" segment conducted through Enterprise Zoom meetings – and treated as a trusted and visible Enterprise participant. Defendants' leadership publicly praised Plaintiff's performance, referred to him as a "Symmetry celebrity," and solicited his participation in high-profile Enterprise functions, including a requested voiceover introduction for an Enterprise award presentation.

154. Defendants deprived Plaintiff of access to Enterprise-controlled systems essential to his work – including internal calendars, agent referral pathways, lead access, communication channels, and carrier contracting – rendering continued participation economically impossible.

155. Defendants' actions operated as a constructive discharge by stripping Plaintiff of the practical ability to earn income, service clients, or complete transactions that had already been structured, client-approved, and positioned for submission or funding through carrier channels.

47

156.    In addition to constructive discharge, Defendants engaged in conduct intended to blacklist Plaintiff within Enterprise-controlled distribution channels by discouraging agent referrals, restricting calendar placement, withholding client attribution, and communicating narratives that undermined Plaintiff's professional standing and credibility among Enterprise participants, as reflected in contemporaneous communications and actions described herein. These actions functioned as a de facto industry blacklist within Enterprise-controlled distribution channels, as Defendants exercised gatekeeping authority over agent referrals, calendars, carrier access, and revenue attribution nationwide.

157.    Defendants exercised control over carrier relationships and internal approvals in a manner that foreclosed Plaintiff's access to markets and clients despite Plaintiff's licensure, experience, and demonstrated ability to conduct compliant business.

158.    Plaintiff was not provided any meaningful opportunity to respond, contest the termination, or reconcile diverted compensation because Defendants had already stripped him of access to Enterprise-controlled systems, agents, and calendars necessary to generate income. Plaintiff's exclusion from enterprise channels, combined with directed agent avoidance and reputational disparagement, rendered continued participation futile and eliminated any practical avenue for internal remediation.

159.    Defendants' termination and blacklisting actions occurred shortly after Plaintiff's protected activity and were inconsistent with Defendants' prior representations, treatment of similarly situated individuals, and internal acknowledgments of Plaintiff's contributions.

159A.  **Predicate Act Micro-Attribution – Blacklisting / Reputational Sabotage (¶¶ 121–132, 156–159 | June–July 2025): Actor(s):** Defendant McManamon (primary disseminator), with knowledge/ratification by leadership as pleaded. **Channel:** Enterprise-controlled communications

to agents and referral channels (interstate wires). **Date/Window:** June–July 2025. **Misrepresentation/Omission:** False narratives (including stolen-luggage pretext and competence disparagement) used to justify exclusion and deter referrals. **Mechanism:** Coordinated discouragement of calendar placement/referrals and reputational undermining within Enterprise channels. **Property Loss:** Loss of identifiable referral-driven commissions and destruction of business expectancy/goodwill within Enterprise-controlled distribution systems, as pleaded.

160. As a direct and foreseeable consequence of the specific acts and system restrictions described above, including referral diversion, calendar exclusion, and commission-routing control, Plaintiff suffered immediate and continuing economic harm, including loss of current income, loss of future business opportunities, reputational injury within a tightly controlled industry network, and inability to recover earned commissions. These losses are capable of calculation through carrier records, commission schedules, and enterprise system data within Defendants' possession or control.

### K.    Interstate Commerce and Enterprise Impact

161. At all times relevant to this action, Defendants' conduct occurred in, and substantially affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(1) and 1962.

162. Defendants operated a nationwide insurance-marketing and financial-services Enterprise that recruited agents, solicited clients, distributed marketing materials, transmitted directives, directed and controlled compensation routing and attribution, and coordinated business activity across multiple states.

163. The Enterprise routinely utilized interstate wires, including but not limited to email, cloud-based customer relationship management platforms, electronic commission-routing and tracking systems, telephonic conferencing, Zoom meetings, messaging applications, and

49

proprietary web portals, to conduct its affairs and coordinate actions among Enterprise participants located in different states.

164. Defendants further utilized the United States mail and interstate delivery services to disseminate standardized mortgage-protection mailers, client communications, disclosures, and insurance-related documents to agents and consumers nationwide.

165. Plaintiff's recruitment into the Enterprise, onboarding, training, lead distribution, client engagement, compensation routing, retaliation, and termination were all effectuated through interstate communications transmitted by Defendants across state lines.

166. Client relationships developed by Plaintiff – including high-value engagements involving insurance, annuity, and advanced-markets strategies, including the largest client engagement of Plaintiff's professional career – required interstate coordination among Defendants, carriers, financial institutions, and Enterprise personnel operating in multiple jurisdictions.

167. Defendants' compensation systems, carrier appointment processes, and commission-distribution mechanisms were centralized, standardized, and administered across state boundaries, such that the diversion, withholding, and reallocation of Plaintiff's commissions necessarily implicated interstate commerce.

168. The Enterprise's recruiting, training, and sales practices were standardized and replicated nationwide, affecting numerous agents and clients across multiple states and generating revenue streams transmitted through interstate financial channels. The Enterprise alleged herein is distinct from the individual Defendants themselves, consisting of an association-in-fact defined by shared systems, coordinated decision-making, centralized control mechanisms, and revenue-preserving practices that existed independently of any single Defendant's participation.

169. Defendants' retaliatory conduct – including system lockouts, cancellation of carrier appointments, suppression of internal reporting, and interference with Plaintiff's client relationships – was executed through interstate systems and produced interstate economic effects.

170. The racketeering acts alleged herein – including fraudulent recruitment communications, deceptive marketing transmissions, commission diversion, suppression of compliance escalation, and retaliatory system restrictions – were integral to Defendants' ongoing business model and were carried out through interstate mail and wire communications.

171. The conduct described above was not isolated, local, or incidental in nature, but constituted a continuous and coordinated course of activity national in scope and essential to the Enterprise's operations.

172. By reason of the foregoing, Defendants conducted and participated in the conduct of an Enterprise affecting interstate commerce within the meaning of the Racketeer Influenced and Corrupt Organizations Act. The racketeering acts alleged herein were not incidental to a legitimate business, but constituted the means by which the Enterprise recruited participants, monetized their labor and client relationships, suppressed compliance escalation, and enforced silence through economic retaliation. Retaliation was not a byproduct of the scheme; it was an enforcement mechanism essential to its continuation. The Enterprise's use of retaliation to suppress compliance escalation functioned as a repeatable enforcement mechanism applied through Enterprise-controlled authority structures and was implemented in a manner that preserved revenue streams and centralized control.

173. The following table and accompanying attribution paragraphs summarize representative predicate acts further detailed throughout this Complaint, including allegations pled both above

51

and below, and are intended to provide a consolidated reference to the racketeering conduct alleged herein.

173A. Between March 2025 and July 2025, Defendants committed the racketeering acts summarized in Table 1 through Enterprise-directed interstate communications, including email, nationwide Zoom conferences, telephonic calls, Enterprise-controlled web portals, internal CRM and scheduling systems, and the United States mail. The acts summarized below are representative, not exhaustive, and are pleaded with reference to the detailed factual allegations cross-referenced in Table 1 and incorporated herein by reference. These representative summaries are provided solely to assist the Court in evaluating the elements of the pleaded claims and are not intended to create redundancy or ambiguity.

173B. **Fraudulent Recruitment (¶¶ 55–59 | March 2025).** In or about March 2025, Defendants Brett Beaudry, and Craig McManamon, acting with both actual and apparent authority on behalf of the Enterprise, transmitted standardized recruiting representations to Plaintiff through Enterprise recruiting portals, promotional videos, email communications, and Zoom meetings. These interstate communications falsely represented independence, compensation transparency, compliance infrastructure, and professional autonomy, and were calculated to – and did – induce Plaintiff to enter the Enterprise (¶¶ 55–59).

173BA. **Representative "who/what/when/where/how" for ¶173B:** On or about March 6, 2025, during a Zoom recruiting meeting disseminated through interstate wires, Defendant Beaudry and/or McManamon represented in substance that Plaintiff would be operating as an independent business owner, that agents "own" or control their client relationships/book of business, and that commissions would be properly credited and transparently paid through

52

Enterprise systems. The representations were made through Zoom meeting title / email subject line, transmitted via Zoom/email/web portals, and were designed to induce reliance.

173BB.  These recruiting representations were materially false or misleading when made because Defendants retained undisclosed centralized control over **(i)** client attribution and reassignment, **(ii)** commission routing and suppression, and **(iii)** continued access to income-producing systems, and Defendants did not disclose that client ownership and commissions could be rerouted or reassigned without Plaintiff's consent through Enterprise-controlled platforms. Plaintiff relied on these representations by entering the Enterprise, introducing client relationships, and performing Enterprise-directed work, after which Defendants used those same systems to divert commissions, restrict access, and reassign client relationships as pleaded.

173C.  **Concealment of Licensing Deficiencies (¶¶ 71–84 | March–June 2025).** From May through June 2025, Defendants Tim Taylor Smith, Chris Leake, and Craig McManamon concealed material licensing limitations during Enterprise-directed advanced-markets activity. This conduct occurred through client-facing discussions conducted via Zoom, phone, and email, and involved residents of Arkansas (May 29, and June 6, 2025), Louisiana (June 2 and June 5, 2025), Colorado (June 11, 2025), and Alaska (June 2 and June 10, 2025) (¶¶ 71–84, 103–104, 125). The concealment and related role portrayals occurred with the knowledge, participation, and/or ratification of Enterprise leadership, including corporate Defendants and individual Defendants Lisa Kimbrell, Kyle Kimbrell, Sierra Smith-Simonds, and Brett Beaudry, each of whom had contemporaneous knowledge of Plaintiff's compliance objections and the associated licensure deficiencies.

173CA. **Representative "who/what/when/where/how" for ¶173C:** During May–June 2025, in connection with advanced-markets activities involving residents of Arkansas (May 29 and June 6, 2025), Louisiana (June 2 and June 5, 2025), Colorado (June 11, 2025), and Alaska (June 2 and June 10, 2025), Defendants Tim Taylor Smith, Chris Leake, and Craig McManamon participated in, directed, and/or facilitated client-facing planning and strategy discussions via interstate Zoom, telephone, and email while omitting material facts regarding Smith's regulatory and licensing limitations, including that **(i)** Smith was not licensed or authorized in Arkansas (May 29 and June 6, 2025), Louisiana (June 2 and June 5, 2025), Alaska (June 2 and June 10, 2025), and Colorado (June 11, 2025) during the relevant solicitations; **(ii)** Smith was not appointed and/or otherwise authorized to solicit, negotiate, or transact the life-insurance and/or annuity business being discussed in one or more of AR, AK, LA, and CO during the relevant solicitations; and **(iii)** Smith was not registered and/or authorized to engage in investment-advisory or securities activity in one or more of AR, AK, LA, and CO during the relevant discussions. These omitted licensing and authorization facts were uniquely within Defendants' knowledge and rendered Enterprise communications and role portrayals misleading, because Defendants presented Smith (and the advanced-markets function) as authorized and compliant while concealing limitations bearing directly on legality, compliance risk, and client reliance.

173CB. **Representative "who/what/when/where/how" for ¶173C (Alaska Rental-Property Liquidation Scheme):** During June 2025, through interstate Zoom and telephone communications transmitted to and from Alaska, Defendant Tim Taylor Smith urged an elderly Alaska couple to sell an income-producing five-plex generating approximately $8,000–$9,000 per month and to reposition approximately $540,000 of proceeds into annuity and managed-asset products through Enterprise channels. Smith represented that the property carried a "large capital

Case 1:26-cv-00082-MOC-WCM    Document 1    Filed 03/17/26    Page 54 of 127

gain" and that the proposed repositioning would provide suitable retirement income, while omitting that he lacked licensure in Alaska to provide such advisory communications and omitting that the proposed repositioning could not reasonably replicate the existing rental income.

173CD. These communications were transmitted through interstate wires and Enterprise scheduling systems and were witnessed by Enterprise agent "Rocky." The scheme was designed to induce liquidation of a specific income-producing asset and transfer of control over client funds into Enterprise-directed products generating commissions and revenue for the Enterprise. The conduct constitutes a representative wire-fraud predicate act under 18 U.S.C. § 1343 because it involved materially false statements and omissions made through interstate wires in order to obtain money or property and associated commission streams.

173D. **Deceptive Mortgage-Protection Mail Funnel (¶¶ 85–93 | March–June 2025).** During March through June 2025, Defendants Chris Leake, Craig McManamon, and Enterprise leadership disseminated and enforced the use of Enterprise-approved mortgage-protection mailers transmitted through the United States mail and interstate delivery services, including materials styled as urgent or official notices. These mailings were deployed as part of a uniform nationwide sales funnel directed by the Enterprise (¶¶ 85–93).

173DA. **Representative "who/what/when/where/how" for ¶173D:** During March–June 2025, the Enterprise disseminated standardized mortgage-protection solicitation mailers through the United States mail and interstate delivery services, including materials captioned "FINAL MORTGAGE NOTICE – COMPLETE AND RETURN." The exemplar, as reflected in Exhibit 21 reflects the uniform nationwide format, including "Mortgage Protection Plan" references, borrower-information fields, response deadlines, and instructions directing recipients to return the form or call a listed number. The layout and language were designed to create urgency and to

55

imply affiliation with the recipient's mortgage lender while omitting material disclosures regarding the commercial nature of the solicitation and the Enterprise's financial interest in resulting insurance transactions. These mailers were paired with Enterprise-approved scripts and follow-up calls instructing agents to convey that prompt action was necessary to secure mortgage-related protection benefits. The mailers functioned as a nationwide inducement mechanism transmitted through interstate mail and wires to generate consumer leads and revenue for the Enterprise as alleged in ¶¶ 85–93 and constitute representative mail- and wire-fraud predicate acts under 18 U.S.C. §§ 1341 and 1343. Illinois regulatory action in 2016 placed the Enterprise and its leadership on notice of compliance risk concerning bank-name and mortgage-related marketing representations.

173E. **Misappropriation of Proprietary Methodologies (¶¶ 88–89, 281–284 | May–June 2025).** In May and June 2025, Defendant Chris Leake, through interstate telephone calls and Enterprise-controlled internal systems, appropriated and redeployed Plaintiff's proprietary IRMAA mitigation and advanced-markets methodologies following Plaintiff's disclosures, without compensation, while excluding Plaintiff from the resulting revenue pathways (¶¶ 88–89, 281–284).

173F. **Income-Pipeline Sabotage via Nationwide Zoom (¶¶ 105–107 | June 10–13, 2025).** On or about June 10, 2025, Defendant Craig McManamon, during a nationwide Enterprise Zoom meeting, minimized Plaintiff's compliance escalations as "commission confusion" and authorized the re-routing of Plaintiff's appointments and referrals away from Plaintiff through Enterprise scheduling systems, thereby dismantling Plaintiff's income pipeline in furtherance of Enterprise objectives (¶¶ 105–107).

173G. **Obstruction and Suppression of Escalation (¶¶ 112–114 | June 19, 2025).** On or about June 19, 2025, Defendant Lisa Kimbrell, during a recorded interstate telephone call, urged Plaintiff not to escalate compliance concerns, offered financial accommodation that Plaintiff reasonably understood to be conditioned on silence, requested surrender of evidence, and sought to contain reasonable regulatory exposure. These communications, transmitted through interstate wires and contemporaneously documented, constitute representative wire-based obstructive conduct as described in ¶¶ 112–114.

173H. **Retaliatory System Exclusion (¶¶ 133–141 | June–July 2025).** Beginning in June 2025 and continuing into July 2025, Defendants Craig McManamon, Chris Leake, Sierra Smith-Simonds, Brett Beaudry, and others implemented Enterprise-wide system lockouts, calendar removals, CRM exclusion, and access restrictions against Plaintiff following protected whistleblowing activity, using Enterprise platforms and interstate systems (¶¶ 133–141).

173I. **Retaliation Against Plaintiff's Son (¶¶ 142–151 | June–July 2025).** During June–July 2025, Defendant Brett Beaudry, acting with Enterprise authority, removed Plaintiff's son from Enterprise-controlled platforms and access channels shortly after Plaintiff's protected activity, to punish whistleblowing and deter reporting to regulators (¶¶ 142–151).

173J. **Blacklisting and Reputational Sabotage (¶¶ 121–132, 156–159 | June–July 2025).** From June through July 2025, Defendant Craig McManamon, with the knowledge and ratification of Enterprise leadership, disseminated false and disparaging statements through interstate Enterprise communications, discouraged referrals, and blacklisted Plaintiff within Enterprise-controlled distribution channels, interfering with Plaintiff's client relationships and business expectancy (¶¶ 121–132, 156–159).

173K. **Misrepresentation of Advisory Authority and AUM (¶¶ 75–82 | May–June 2025).**

During May–June 2025, Defendants disseminated Enterprise-approved client-facing materials and event-registration pages, through Enterprise marketing platforms and interstate wires, representing Defendant Smith as overseeing "over $400 million in assets" without disclosure of the basis, scope, or regulatory classification of such figures, representations materially inconsistent with SEC-reported filings and licensure records reviewed contemporaneously by Plaintiff (¶¶ 75–82).

173KA. **Representative "who/what/when/where/how" for ¶173K:** During May–June 2025, Enterprise-controlled marketing and scheduling platforms disseminated client-facing event-registration and appointment-confirmation communications representing Defendant Tim Taylor Smith as managing or overseeing "over $400 million in assets" and holding various advisory and fiduciary credentials. One representative communication, transmitted via interstate wire through the Calendly scheduling platform and delivered by email to Plaintiff's Gmail account on or about June 10, 2025, confirmed an "Estate/Financial Consultation" and included a Zoom meeting link, meeting ID, and promotional biography stating that Smith "currently manages over $400 million in assets for his clients." The communication was disseminated through interstate web and email systems and is reflected in Exhibit 15. These representations omitted material disclosures concerning the basis, scope, regulatory classification, and registration status associated with the claimed assets-under-management figure and advisory authority, and were materially misleading because they conveyed authority, scale, and fiduciary status likely to induce attendance, reliance, and participation in Enterprise revenue-generating activity without disclosing licensure and registration limitations known to Defendants.

173L. The predicate acts summarized in Table 1 are representative, not exhaustive, and are pleaded with reference to the factual allegations incorporated herein. Each representative act is pleaded with the particularity required by Rule 9(b), including the actor, communication channel, timeframe, and resulting property injury as identified in the incorporated factual paragraphs and micro-attribution summaries.

173M. To facilitate the Court's evaluation under Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6), the predicate micro-attribution paragraphs (e.g., ¶¶ 59A, 93A, 104A, 107A, 114A, 141A, 151A, 159A) consolidate, in one place, the actor, channel, time window, misrepresentation or omission, operational mechanism, and resulting business or property injury for each representative predicate act. These specific details confirm Plaintiff's direct personal knowledge and the support provided by contemporaneous recordings, documents, and communications identified throughout this Complaint, ensuring each alleged act of racketeering is pleaded with particularity.

*TABLE 1 – Predicate Acts:* Each predicate act listed below is independently actionable and is supported by the specific paragraphs cited; no predicate relies upon or incorporates conduct alleged solely in support of a different statutory violation.

| Supporting ¶¶ | Date Range | Statute | Predicate Act | Representative Racketeering Conduct | Interstate Nexus |
|---|---|---|---|---|---|
| ¶¶ 55–59 | March 2025 | 18 U.S.C. § 1343 | Wire Fraud | Fraudulent recruiting Representations, transmitted via email, recruiting portals, and nationwide Zoom calls, regarding independence, compensation transparency, compliance infrastructure, and autonomy, inducing Plaintiff to enter the Enterprise | Email, recruiting portals, nationwide Zoom |

59

| | | | | | |
|---|---|---|---|---|---|
| ¶¶ 71–84 | Mar – June 2025 | 18 U.S.C. § 1343 | Wire Fraud | Concealment of material licensing deficiencies during advanced-markets and retirement-planning activity conducted via Zoom, phone, and email | Zoom, phone, email |
| ¶¶ 72–74, 72A | May–June 2025 | 18 U.S.C § 1343 | Wire Fraud | Inducing Alaska couple to liquidate income-producing property through materially false income-replacement and licensure representations | Zoom; interstate communications |
| ¶¶ 75–82 | May – June 2025 | 18 U.S.C. § 1343 | Wire Fraud | Interstate dissemination of Enterprise-approved client-facing materials and web event-registration pages, via enterprise marketing platforms and interstate wires, presenting materially inconsistent representations regarding advisory authority and assets under management relative to SEC reported filings, without disclosure of the basis, scope, or regulatory classification of such figures, without disclosure or corrective clarification, in furtherance of Enterprise recruitment, solicitation, and revenue generation. | Enterprise marketing platforms; web portals; interstate wire communications |
| ¶¶ 85–93 | Mar – June 2025 | 18 U.S.C. §§ 1341, 1343 | Mail/Wire Fraud | Dissemination of deceptive mortgage-protection mailers and standardized scripts via U.S. Mail and interstate communications | U.S. Mail; interstate communications |
| ¶¶ 88–89, 281-284 | May – June 2025 | 18 U.S.C. § 1343 | Wire Fraud | Appropriation and redeployment of Plaintiff's proprietary IRMAA and advanced-markets methodologies via phone and internal enterprise systems, without compensation | Phone; internal systems |

| ¶¶ 105–107 | June 10–13, 2025 | 18 U.S.C §§ 1343, 1513(e) | Wire Fraud / Retaliation | Nationwide Zoom calls minimizing commission diversion, discouraging escalation, and dismantling Plaintiff's income pipeline in furtherance of Enterprise objectives | Nationwide Zoom |
|---|---|---|---|---|---|
| ¶¶ 112–114 | June 19, 2025 | 18 U.S. §§ 1343, 1512(b), 1513(e) | Wire Fraud / Witness Tampering / Retaliation | Inducement, via interstate phone communications, to suppress escalation, offers of compensation for silence, and containment of enterprise exposure | Phone; interstate communications |
| ¶¶ 121–132, 156–159 | June – July 2025 | 18 U.S.C §§ 1343, 1513(e) | Wire Fraud / Retaliation | Blacklisting, diversion of client relationships, and reputational sabotage via interstate enterprise communications | Interstate Enterprise communications |
| ¶¶ 133–141 | June – July 2025 | 18 U.S.C. §§ 1343, 1513(e) | Wire Fraud / Retaliation | System lockouts, calendar removals, and CRM exclusion following protected whistleblowing activity | Enterprise Platforms |
| ¶¶ 142–151 | June – July 2025 | 18 U.S.C. §1513(e) | Retaliation | Termination of Plaintiff's son to punish whistleblowing and deter reporting to regulators | Enterprise systems |

61



***Demonstrative Reference Image K-1:*** **Enterprise Leadership and Financial Scale** [The following image depicts senior Enterprise founders publicly celebrating the scale and valuation of the business during the same period in which the racketeering conduct alleged herein was ongoing. Such materials are not offered to establish liability independently, but to corroborate enterprise association, knowledge, opportunity, and state of mind.]

## COUNT I
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### *18 U.S.C. § 1962(c)*
*(Against All Defendants)*

174. Plaintiff incorporates the preceding paragraphs relevant to this Count, only to the extent necessary to state this claim.

### A.    The Enterprise

175. At all relevant times, Defendants constituted an association-in-fact Enterprise within the meaning of 18 U.S.C. § 1961(4), consisting of corporate entities, individual leadership, recruiting agents, and operational systems functioning as a continuing unit with relationships and longevity sufficient to pursue a common purpose. The Enterprise was distinct from each Defendant as a RICO "person," and each Defendant conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity alleged herein.

176. The Enterprise had a common purpose of generating revenue through centralized recruitment, standardized sales practices, controlled lead distribution, Enterprise-directed compensation systems, and suppression of internal compliance escalation.

176A. The Enterprise alleged herein is distinct from each Defendant "person." Each Defendant is a RICO "person" sued in an individual or entity capacity for participating in the conduct of Enterprise affairs; the Enterprise is the ongoing association-in-fact comprised of the Corporate Defendants, Individual Defendants, and associated persons and entities functioning through Enterprise-controlled platforms, routing systems, compensation mechanisms, compliance pathways, and supervisory authority structures that exist and operate beyond any single Defendant's individual acts.

177. Defendants' suppression of internal compliance escalation and regulatory reporting furthered the Enterprise's financial objectives by preserving revenue streams, avoiding scrutiny that would disrupt standardized sales practices, and enabling continued commission retention and diversion through Enterprise-controlled systems. By removing Plaintiff and reassigning his clients and income streams through Enterprise-controlled systems, Defendants ensured continued revenue flow to the Enterprise while eliminating internal resistance to practices that posed regulatory and reputational risk.

178. Defendants knew or reasonably foresaw that Plaintiff's documented disclosures and preserved recordings created a substantial likelihood of regulatory inquiry, including reasonably foreseeable proceedings within the jurisdiction of the Securities and Exchange Commission and related federal or state authorities. Defendants' inducements, discouragements, and suppression efforts were undertaken with the intent to influence or prevent such reasonably foreseeable proceedings. On or about June 23, 2025, Plaintiff submitted a Tip, Complaint, or Referral

63

("TCR") to the United States Securities and Exchange Commission together with a sworn whistleblower affidavit and supporting documentation concerning the conduct at issue. Documentation of those submissions will be filed under seal as appropriate. Following Plaintiff's SEC submission, Defendants continued and escalated retaliatory conduct affecting Plaintiff's access to Enterprise systems, income-producing opportunities, and contractual relationships.

179. The Enterprise maintained relationships among its members through contractual hierarchies, mandatory communications, centralized technology platforms, standardized training, and coordinated decision-making.

180. The Enterprise had longevity sufficient to pursue its purpose. It operated continuously for years through standardized recruiting funnels, lead-generation and routing systems, compensation hierarchies, and centrally directed sales and training practices, and it persisted through repeated and related acts that posed a threat of continued racketeering activity. The Enterprise's longevity is further evidenced by its continuation of materially similar mortgage-protection solicitation practices after prior state regulatory action concerning mortgage-related marketing representations, including the Illinois administrative cease-and-desist action reflected in Exhibit 25A, and after related public investigative reporting and materials reflecting continued use of substantially similar solicitation formats at scale, as reflected in Exhibit 25 and Exhibit 21.

180A. The Enterprise's use of retaliation was not incidental or reactive but functioned as an internal enforcement mechanism used to discipline dissent, suppress compliance escalation, preserve revenue, and maintain centralized control over compensation and client access. Consistent with that enforcement structure, the Enterprise's operational systems enabled leadership to neutralize compliance resistance by restricting access to calendars, client routing, lead flow, and commission attribution – thereby converting protected reporting activity into an

64

economic event (loss of access and income) that discouraged further escalation. Enterprise leadership communications, recruiting videos, and promotional materials reflecting the continued expansion of mortgage-protection revenue operations notwithstanding known compliance risk are reflected in Exhibit 4, supporting the inference that retaliation and suppression mechanisms were integral to continuity and not an isolated response to Plaintiff.

## B.   Conduct or Participation

181.   Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

182.   Defendants violated 18 U.S.C. § 1962(c) by conducting and participating in the conduct of the Enterprise's affairs through a pattern of racketeering activity. Their knowing participation in Enterprise affairs included repeated predicate acts of mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), witness tampering (18 U.S.C. § 1512(b)), and retaliation against a witness or informant (18 U.S.C. § 1513(e)). Each Defendant's conduct alleged herein constitutes participation in the operation or management of the Enterprise itself, including through direct decision-making authority, supervision, authorization, ratification, or knowing use of Enterprise-controlled systems, satisfying the "conduct or participate" requirement of 18 U.S.C. § 1962(c) as interpreted in *Reves v. Ernst & Young*.

182A.   The predicate acts attributed below are pleaded based on each Defendant's direct participation, authorization, ratification, or knowing use of Enterprise-controlled systems, and are alleged with temporal, factual, transactional, and role-specific particularity sufficient to satisfy Fed. R. Civ. P. 9(b) and to apprise each Defendant of the conduct forming the basis of Liability.

182B.   Plaintiff does not assert securities fraud as a predicate act for purposes of 18 U.S.C. § 1961. Any references to securities-related activity are provided solely as contextual evidence of

Defendants' conduct, misrepresentations, and Enterprise control mechanisms, and not as independent securities-fraud predicates.

## C.     Predicate Act Attribution to Individual Defendants

183.    Defendant Craig McManamon committed predicate acts of wire fraud and retaliation by knowingly using Enterprise interstate communications, including the June 10, 2025 nationwide Zoom call, as a vehicle to minimize and reframe Plaintiff's escalations as "commission confusion," a materially false characterization that authorized bypass of Plaintiff as SME and enabled diversion of Plaintiff's appointments and commissions through Enterprise scheduling systems (¶¶ 105–107), and by disseminating retaliatory disparagement and blacklisting communications to agents through Enterprise channels (¶¶ 121–132). McManamon exercised operation-or-management control by directing SME workflow rules, authorizing calendar and referral routing practices, influencing compensation pathways, and enforcing exclusion through Enterprise-controlled systems. During the June 10, 2025 nationwide Zoom meeting, transmitted via interstate wire to agents located across multiple states, McManamon stated in substance that Plaintiff's escalation constituted mere "commission confusion" and that SME routing could be bypassed, after which Plaintiff's calendar access and appointment routing were in fact diverted through Enterprise scheduling systems.

184.    Defendant Lisa Kimbrell engaged in conduct constituting alleged predicate acts of wire fraud and retaliation by initiating and participating in the recorded June 19, 2025 interstate call to discourage escalation, request surrender of evidence, offer financial accommodation to deter reporting, and contain foreseeable regulatory exposure (¶¶ 112–114, 115–120), and by ratifying continued diversion and system-based exclusion after Plaintiff refused to abandon protected activity (¶¶ 115–120, 152–160). Plaintiff returned the call the same day and advised Kimbrell of

66

the licensure concerns and compliance issues previously escalated internally. Lisa Kimbrell exercised operation-or-management control by influencing escalation handling, directing or ratifying compensation allocation responses, and using Enterprise leadership authority to induce silence and preserve Enterprise revenue continuity.

185. Defendant Tim Taylor Smith committed predicate acts of wire fraud and retaliation through Enterprise-directed multi-state solicitation and securities-adjacent communications outside the licensure footprint reflected in public regulatory records (¶¶ 71–79, 103–104, 125), including conduct that appropriated Plaintiff's largest client opportunity while operating outside the licensure scope reflected in contemporaneous public regulatory records contemporaneous with Plaintiff's protected activity (¶¶ 103–104). Smith exercised operation-or-management control within the Advanced Markets function by inserting himself as the Enterprise-authorized strategy actor in client engagements, redirecting asset movement and client attribution through Enterprise access, and causing economic reallocation away from Plaintiff through Enterprise-enabled authority. Between May and June 2025, through interstate email and text communications, Smith directed enterprise insurance agents to open or assist with Charles Schwab brokerage accounts for clients, including directing agent Jason Shorrock to open such an account with assistance from Haley Boegler of Quility Financial Advisors in Florida, and stating on or about June 2, 2025 that he had been barred by FINRA but that everything was "good to go now," while continuing to coordinate brokerage-account activity through interstate communications and enterprise channels.

185A. Smith's interstate communications also included representations to Alaska clients concerning the liquidation of an income-producing five-plex property and repositioning of approximately $540,000 into Enterprise-directed products despite Smith's lack of licensure in

Alaska and despite income projections that could not reasonably replicate the existing rental stream, conduct undertaken through interstate wires and designed to obtain control over client assets and associated commission revenue.

186. Defendant Chris Leake committed predicate acts of mail fraud, wire fraud, and retaliation by authoring, approving, and disseminating standardized mortgage-protection consumer-facing solicitation content and follow-up directives transmitted through interstate mail and interstate wires, including deceptive mailers and distributed wording, scripts, and training directives instructing agents how to present the solicitations to consumers (¶¶ 85–93; Exhibit 21 et seq.). Leake also participated in the conduct of the Enterprise's affairs by causing Enterprise adoption and redeployment of Plaintiff's proprietary IRMAA and advanced-markets methodologies through Enterprise training and materials without compensation (¶¶ 88–89), furthering Enterprise revenue objectives while retaliating against Plaintiff by removing him from Enterprise systems and related compensation pathways. Leake exercised operation-or-management control by creating and enforcing standardized national solicitation language and workflows, directing advanced-markets routing, and causing Enterprise adoption of revenue-generating methodologies while excluding Plaintiff from resulting compensation pathways. Leake further requested that Plaintiff provide screenshots and information regarding third-party debt-elimination software and advanced-markets tools during and after the Florida Advanced Markets boot camp, stating his intent to replicate or "one-off" such tools for enterprise use, and made these requests through interstate communications while simultaneously directing standardized mortgage-protection mailers and scripts through interstate mail and wire channels.

187. Defendant Kyle Kimbrell committed predicate acts of retaliation and participated in Enterprise misrepresentations and enforcement actions by making and disseminating materially

68

misleading independence/ownership representations through Enterprise channels (¶¶ 25, 110–111), and by participating in, authorizing, or permitting retaliatory exclusion and adverse system actions following Plaintiff's protected activity (¶¶ 116–120, 128–129, 156–159). Kyle Kimbrell exercised operation-or-management control by holding himself out as an agency principal with authority over recruiting representations, client "ownership" policy messaging, and by ratifying or permitting Enterprise enforcement actions implemented through system controls and referral gatekeeping. During an enterprise leadership dinner attended by agents and SMEs from multiple states, Kyle Kimbrell stated in substance that agents unable to place clients with enterprise-approved products could obtain outside products notwithstanding enterprise representations of centralized control, a statement Plaintiff alleges was materially misleading and communicated to multi-state attendees engaged in enterprise-directed client placements.

188. Defendant Brett Beaudry committed predicate acts of wire fraud and retaliation by inducing recruitment through Enterprise-approved interstate recruiting materials and communications (¶¶ 33, 55–59, 142–151) and by effectuating the removal of Plaintiff's son from Enterprise-controlled platforms shortly after Plaintiff's protected activity (¶¶ 142–151). Beaudry exercised operation-or-management control by controlling onboarding access, platform authorization, and termination/lockout decisions within Enterprise systems used to confer or deny the ability to earn income. Shortly after Plaintiff's protected activity and refusal to participate in certain recruitment directives, Beaudry used enterprise electronic systems operating in interstate commerce to remove Plaintiff's son from enterprise platforms and income-producing channels.

189. Defendant Sierra Smith-Simonds committed predicate acts of wire fraud and retaliation by coordinating Enterprise-directed meetings and administrative actions implementing and ratifying Plaintiff's exclusion following protected activity (¶¶ 108–109, 118–120, 133–141).

Smith-Simonds exercised operation-or-management control by administering and executing adverse access actions, coordinating leadership communications affecting Plaintiff's Enterprise standing, and implementing decisions that removed Plaintiff from the income-producing Enterprise workflow. Following Plaintiff's protected activity, Smith-Simonds directed Plaintiff to cease training enterprise agents on generating independent leads outside enterprise-paid lead systems and participated in administrative actions restricting Plaintiff's access to enterprise platforms and agent-training channels through interstate electronic systems.

190. The predicate acts described above were related and constituted a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(5) and 1962(c). The acts involved common participants, methods, and affected compensation and client-attribution systems controlled by the Enterprise. Where representative date ranges are pleaded, they reflect repeated use of standardized Enterprise systems across multiple communications and transactions. Plaintiff possesses additional specific instances supporting each category of conduct.

190A. **Predicate Act – June 10, 2025 Nationwide Zoom Call (¶¶ 105–107): Actor:** Defendant Craig McManamon. **Channel:** Interstate Zoom conference transmitted nationwide. **Date:** June 10, 2025. **Misrepresentation:** During the June 10, 2025 nationwide Zoom, McManamon stated in substance that Plaintiff's escalation involved mere "commission confusion" and that the matter should be treated as a routine administrative issue, thereby minimizing the compliance substance and signaling that Plaintiff's SME routing and calendar access could be bypassed through Enterprise scheduling controls. **Mechanism:** Enterprise-controlled SME workflow rules and calendar routing systems. **Property Loss:** Diversion of Plaintiff's SME appointments and identifiable commission opportunities traceable through Enterprise scheduling and carrier remittance systems.

70

**190B. Predicate Act – June 19, 2025 Interstate Retaliation and Containment Call (Witness Tampering and Retaliation Conduct; 18 U.S.C. §§1512(b), 1513(e)) (¶¶ 112–120): Actor:** Defendant Lisa Kimbrell. **Channel:** Interstate telephonic communication. **Date:** June 19, 2025. **Obstructive Conduct / Endeavor:** During the June 19, 2025 call, Kimbrell stated in substance that Plaintiff should not escalate the matter "to the wrong people," requested that Plaintiff provide, surrender, or refrain from disseminating evidentiary materials, and urged Plaintiff to accept informal remediation or accommodation in lieu of further escalation. Plaintiff advised Kimbrell of the licensure concerns, compliance breakdowns, and the regulatory implications of the conduct at issue. Plaintiff did not disclose the timing, recipients, or substance of any prospective regulator submissions during the call. **Predicate Treatment:** The foregoing conduct constituted corrupt persuasion and improper inducement intended to influence, delay, or prevent Plaintiff's communication of information to federal and state regulators concerning potential securities and insurance misconduct, and further constituted retaliation for Plaintiff's protected reporting activity. **Mechanism:** Enterprise leadership authority over escalation handling, access controls, and compensation routing; ability to condition remediation and continued participation on withdrawal of escalation. **Property Loss / Injury:** Continued diversion of Plaintiff's commissions and client opportunities through Enterprise-controlled routing and access restrictions following Plaintiff's refusal to abandon protected activity.

**190C. Predicate Act – Advanced Markets Client Appropriation (¶¶ 103–104, 125): Actors:** Defendant Tim Taylor Smith (primary); Jason Shorrock (recap drafter); and Enterprise leadership copied, endorsing, or otherwise participating, including Chris Leake, Kyle Kimbrell, Lisa Kimbrell, Craig McManamon, Jeff Sigworth, and Berry Taylor, as reflected in the communications. **Channel:** Interstate wires, including interstate email transmissions and

71

nationwide Zoom communications. **Dates:** May 29, 2025 bootcamp solicitation and related interstate communications; June 6, 2025 interstate email chain titled "Reset from Bootcamp," transmitting a "B2B Meeting Recap" of a Zoom meeting with the "MACK" client attended by Defendant Tim Taylor Smith, Jason Shorrock, and Plaintiff Witherell; and June 14, 2025 interstate email from Smith stating, "Waiting on state licensing!" **Misrepresentation/Omission:** Smith held himself out, directly and through Enterprise role portrayal, as the authorized strategy actor directing brokerage-account funding and implementation sequencing for Plaintiff's client, while omitting that required state authority had not been obtained at the time of the earlier solicitation and implementation communications – an omission Smith later confirmed by admitting, "Waiting on state licensing!" **Knowledge/No Corrective Action:** The Enterprise-copied leadership recipients of the June 6 and June 14 communications were on notice, from Smith's own contemporaneous statements, that required authority remained pending; yet the Enterprise did not halt, correct, or unwind Smith's role in the client engagement or restore Plaintiff's client attribution and economic interest, and instead permitted Smith to continue as the portrayed authorized actor. **Use of Wires:** The June 6 and June 14 interstate emails were used to coordinate funding and implementation and to facilitate reassignment of the client relationship and associated economic benefits away from Plaintiff through Enterprise-controlled routing and attribution systems. **Property Loss / Injury:** Appropriation of Plaintiff's identifiable client opportunity and reallocation of associated economic benefits through Enterprise-controlled attribution and routing systems, including loss of commissions and renewal interests tied to the client relationship Plaintiff originated, traceable through Enterprise records, calendars, internal routing, and any carrier placement records created once the Enterprise proceeded.

72

**190D. Predicate Act – Mortgage-Protection Mailer / Solicitation Fraud (Mail Fraud – 18 U.S.C. § 1341; Wire Fraud – 18 U.S.C. § 1343) (¶¶ 85–93; Exhibit 21–24): Actor:** Defendant Chris Leake (and/or Enterprise script approvers/trainers identified in ¶¶ 85–93). **Channel:** Interstate mail (standardized "FINAL MORTGAGE NOTICE"-type mailers and response forms) and interstate wires (training calls, electronically distributed wording and scripts, and follow-up communications directing agent conduct). **Date:** Exemplars include mailers dated February 20, 2025 with "Please Respond By" deadlines such as March 19, 2025, with continued dissemination and use from March through June 2025. **Misrepresentation:** Standardized mortgage-protection solicitations were designed to create urgency and to imply an official connection to the recipient's mortgage obligation or lender, while omitting or obscuring material disclosures regarding the commercial nature of the solicitation and the Enterprise's financial interest in resulting insurance transactions. **Notice / Continuity:** The Enterprise's continued use of materially similar mortgage-related solicitation structures after prior state regulatory action directed at Enterprise-affiliated entities concerning mortgage-related marketing representations supports the inference of continuity and conscious disregard of compliance risk. **Mechanism:** Enterprise-approved mail-funnel lead systems, standardized training workflows, and tracking requirements. **Property Loss:** Consumer-induced transactions and Enterprise revenue generated through standardized deception; and, as to Plaintiff, economic injury through Enterprise-controlled routing/attribution decisions and access restrictions that excluded Plaintiff from income pathways tied to required workflows.

**190E. Predicate Act – Retaliatory System Lockouts / Platform Removal (18 U.S.C. § 1513(e)) (¶¶ 142–151; Exhibit 31 series): Actors:** Defendants Brett Beaudry and Sierra Smith-Simonds, with participation and/or ratification by Chris Leake and other Enterprise

leadership as pleaded in ¶¶ 142–151. **Channel:** Enterprise-controlled electronic platforms, including CRM systems, scheduling tools, SME calendars, internal messaging systems, onboarding/authorization systems, and related access controls administered through interstate network infrastructure. **Proof Anchor:** These restrictions are documented by screenshots, platform notifications, access-denial messages, and contemporaneous communications acknowledging the removals (Exhibit 31; 31A–31C). **Date:** Exemplars include on or about June 20–21, 2025. **Retaliatory Act / Mens Rea:** Shortly after Plaintiff's protected reporting activity, Defendants knowingly caused Plaintiff's and his son's access to income-producing Enterprise systems to be restricted and/or terminated because of that activity. **Pretext / Misrepresentation Component:** Defendants offered administrative or financial rationales – including framing Plaintiff's escalations as "commission confusion" and characterizing Plaintiff's compliance objections as interfering with enterprise revenue or "taking money out of" an upline's pocket – that were inconsistent with contemporaneous records showing Plaintiff's active production role, ongoing client meetings, and the temporal proximity between protected activity and the lockouts. **Mechanism:** Enterprise onboarding, authorization, and lockout controls uniquely controlled by Defendants and used to remove Plaintiff and his son from calendars, communication channels, and client-assignment systems. **Property Loss:** Immediate loss of access to income-producing systems and assigned client opportunities; loss of identifiable commissions, renewals, and business expectancy traceable through Enterprise routing and attribution systems and carrier remittance records to the extent placements proceeded after diversion.

190F.   Where representative date ranges are pleaded, they reflect standardized Enterprise practices repeated across multiple communications and transactions, and Plaintiff possesses additional specific instances for each category of conduct that will be produced in discovery.

74

These ranges are pleaded to illustrate the continuity and regularity of Enterprise practices and not due to any lack of particularized supporting evidence.

190G.  Each predicate act described above formed part of a coordinated pattern through which Defendants maintained control over Enterprise participants and revenue streams, and each act either directly caused or was a substantial factor in causing the diversion of commissions, reassignment of client opportunities, restriction of Plaintiff's access to income-producing systems, or loss of renewal interests. The predicate acts therefore bear a direct relationship to the concrete economic injuries alleged herein and were undertaken to achieve a common unlawful objective.

191.  Defendants participated in the conduct of the Enterprise's affairs by exercising decision-making authority over compensation routing, client attribution, platform access, escalation handling, and enforcement of Enterprise directives, thereby participating in the operation or management of the Enterprise within the meaning of 18 U.S.C. § 1962(c). The Enterprise functioned as a continuing unit with defined roles, centralized decision-making authority over compensation routing and platform access, and enforcement mechanisms used to discipline or exclude participants, and existed as a structure distinct from the predicate acts themselves.

191A.  The Enterprise's governing contractor agreement further confirms Defendants' centralized operational control over proprietary sales software, lead allocation systems, commission routing mechanisms, and access permissions. Under those provisions, access to the Enterprise's systems, leads, and compensation pathways remained contingent upon continued authorization by Enterprise leadership and subject to offset, suspension, or termination controls exercised by Defendants. These mechanisms allowed Defendants to restrict or terminate Plaintiff's and

75

Plaintiff's son's access to income-producing systems and commissions and demonstrate operational authority consistent with the Enterprise's enforcement structure and the operation-or-management element of 18 U.S.C. § 1962(c).

191B. Because access to Enterprise systems, leads, calendars, and compensation pathways remained contingent on Defendants' continued authorization, participants including Plaintiff were economically dependent on those centralized systems for the ability to generate income. Defendants' authority to grant, restrict, or terminate system access therefore constituted the ability to control participants' income-producing activity and the flow of associated commissions, reinforcing Defendants' operational control over the Enterprise's affairs.

191C. Plaintiff's allegations are pleaded in accordance with the requirements of Federal Rules of Civil Procedure 8(a) and 9(b). Where allegations are incorporated by reference, such incorporation is exclusively for the purpose of establishing each claim's elements without creating redundancy, ambiguity, or impermissible shotgun pleading, consistent with clear, concise, and direct averments.

191D. Each Defendant participated in the operation or management of the Enterprise itself and not merely in routine employment activity. Their conduct included directing commission routing decisions, shaping compliance responses, controlling access to Enterprise systems, and participating in interstate communications used to further the conduct described herein.

192. From at least early 2025 through and continuing thereafter, Defendants committed multiple related predicate acts as pleaded herein, constituting a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(5) and 1962(c).

192A. The conduct alleged herein does not arise from a routine contractual or commission dispute but from the coordinated use of Enterprise-controlled systems and interstate

76

communications to induce participation, control revenue-producing activity, suppress compliance escalation, and redirect commissions and client opportunities through a pattern of related acts carried out over time.

193.    The predicate acts involved common participants and common methods, including use of Enterprise-controlled routing, access, and communication systems affecting Plaintiff's compensation and client relationships. The acts were related to one another and occurred in furtherance of the Enterprise's affairs.

194.    The acts were carried out through Enterprise systems, including recruiting funnels, compensation-routing systems, CRM and scheduling platforms, and escalation channels that controlled client ownership and commission attribution.

**D.    Continuity**

194A.   The predicate acts described herein were undertaken pursuant to standardized Enterprise practices governing commission routing, escalation containment, and agent discipline. They shared a common purpose, participants, and methods, and were carried out over a continuous period spanning multiple months. The Enterprise's structure and coordinated communications demonstrate both closed-ended continuity and a threat of continued racketeering activity absent judicial intervention. The foregoing acts reflect a regular way of conducting the Enterprise's affairs rather than isolated or sporadic events. The same centralized systems governing client attribution, commission routing, escalation containment, and access control remained in continuous use throughout the relevant period and were capable of repetition as to other participants. The conduct therefore establishes both closed-ended continuity through repeated related acts over a substantial period and open-ended continuity because the Enterprise retained the structure, incentive, and capacity to continue the same methods absent judicial intervention.

77

195. Defendants' conduct establishes closed-ended continuity because it consists of repeated, related predicate acts occurring from at least early 2025 through the filing of this Complaint and continuing thereafter, reflecting Defendants' regular way of operating through Enterprise systems rather than a discrete or short-term episode.

196. The same compensation-routing systems, lead-funnel practices, and platform controls remain in use as part of Enterprise operations. These systems are capable of repeating the conduct alleged herein absent judicial intervention.

197. The Enterprise engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c), including through the use of interstate mail, wire communications, electronic platforms, insurance carriers operating across state lines, and interstate financial systems used to route, divert, and transmit commissions, client information, and compensation.

**E.    Proximate Cause and Damages**

198. Defendants' racketeering acts directly and proximately caused injury to Plaintiff's business and property, including diversion of commissions, loss of renewal interests, loss of identifiable commission opportunities in active pipeline, and exclusion from Enterprise-controlled income systems. These injuries flowed from Defendants' routing, attribution, and access decisions and from insertion of other participants into Plaintiff-originated client relationships. Plaintiff's losses are traceable through Enterprise records, including calendars, CRM entries, internal routing data, access-control changes, internal communications, and carrier placement and remittance records where transactions proceeded after diversion.

198A. These injuries did not depend upon carrier underwriting decisions, policy issuance, client withdrawal, or any independent third-party discretion. Defendants exercised centralized control

78

Case 1:26-cv-00082-MOC-WCM    Document 1    Filed 03/17/26    Page 78 of 127

over Enterprise CRM access, submission pathways, and internal attribution identifiers (including agent credit/assignment codes), calendar permissions, and commission-routing systems, and used those mechanisms to prevent submission of Plaintiff-originated transactions and to insert other participants into those client relationships. Plaintiff's injury occurred when Defendants altered routing/access controls and reassigned attribution pathways, depriving Plaintiff of the ability to complete submission and earn compensation tied to his origination work. The causal chain between Defendants' conduct and Plaintiff's economic injury is direct.

198B. Plaintiff's injury did not depend upon independent decisions of carriers, clients, or other third parties. The Enterprise's centralized control over CRM access, submission pathways, attribution identifiers, commission-routing systems, and access permissions determined whether compensation would be credited to Plaintiff. Defendants' coordinated alteration of those systems directly caused the diversion or withholding of identifiable compensation opportunities without the intervention of independent third-party discretion.

## F. Damages and Relief

199. Plaintiff's damages arise from identifiable client engagements, established commission structures and renewal schedules that attach upon issuance and placement, and commission interests attached to transactions that had been structured, client-authorized, and entered into Enterprise-controlled systems for submission, funding, or carrier placement prior to Defendants' reassignment of attribution and commission-routing pathways. The amounts alleged reflect good-faith estimates based on available information and will be refined through discovery of Enterprise routing and attribution data, internal accounting, communications concerning reassignment and licensing status, and carrier remittance and placement records to the extent placements proceeded after diversion.

79

199A. To the extent Defendants contend renewal commissions are speculative, facts demonstrate that renewal compensation arises from carrier contracts, commission schedules, and placement records that fix renewal rates and payment formulas upon issuance and placement, subject only to objective contingencies documented in carrier remittance statements and related records. The renewal stream therefore constitutes a traceable, contract-based property interest rather than a speculative expectancy.

200. Defendants' diversion of client relationships, restriction of system access, reassignment of transactions, and rerouting of attribution interrupted active revenue opportunities and deprived Plaintiff of commissions and renewal interests fixed by commission schedules upon placement, as well as commission opportunities tied to transactions in progress. The causal connection between Defendants' conduct and Plaintiff's economic injury is direct. Plaintiff's injuries arose from Defendants' control over routing, attribution, and access systems and were not derivative of harm to third parties.

200A. Defendants' diversion, rerouting, and suppression of attribution and access caused the loss of specific, identifiable commission opportunities and renewal streams tied to Plaintiff-originated client relationships and transactions in progress. Where placements later proceeded after diversion, the resulting commissions and renewals are traceable to Plaintiff's origination work through Enterprise records and carrier remittance data. Where Defendants' interference delayed or blocked submission, Plaintiff's injury includes loss of business expectancy and loss of identifiable pipeline opportunities, proximately caused by Defendants' system controls and reassignment decisions. In multiple instances, Defendants used unlicensed or improperly licensed participants to intercept Plaintiff-originated transactions, preventing submission while positioning

those participants to receive commissions through Enterprise attribution systems upon later licensure.

200B. Plaintiff's injury flowed directly from Defendants' conduct and did not depend upon the independent decisions of third parties. Enterprise-controlled routing systems, access permissions, compensation-allocation structures, and leadership directives were used to reassign, withhold, or terminate commissions generated by Plaintiff. The same Enterprise participants who issued the representations and escalation-containment communications described herein also exercised operational control over the systems that produced the resulting diversion of commissions. Plaintiff's economic injury therefore occurred "by reason of" Defendants' conduct within the meaning of 18 U.S.C. § 1964(c), and was the direct and foreseeable result of those actions.

200C. Plaintiff's injury occurred at the moment Defendants exercised control over Enterprise routing, attribution, and access systems to reassign or withhold Plaintiff-generated commissions and opportunities. That injury did not depend upon the independent decision-making of clients, carriers, or third parties but flowed directly from Defendants' operational control over the mechanisms that determined whether Plaintiff would receive compensation for his work.

200D. To the extent any predicate conduct also involved misrepresentations to third parties, Plaintiff need not plead first-party reliance to state a RICO claim. See *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). Nevertheless, Plaintiff in fact relied on the representations and omissions described herein by continuing to operate within Enterprise systems and delaying regulatory escalation, thereby enabling continued diversion of his commissions.

201. Plaintiff seeks all relief available under 18 U.S.C. § 1964, including treble damages, costs, and attorneys' fees where permitted, together with such equitable relief as may be available under applicable law.

81

# COUNT II
## RICO - CONSPIRACY
### 18 U.S.C. § 1962(d)
(Against All Defendants)

202. Plaintiff incorporates the preceding paragraphs relevant to this Count, only to the extent necessary to state this claim.

203. Defendants agreed to participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). Defendants joined the agreement at different times and in different roles but participated through coordinated use of Enterprise-controlled systems affecting compensation, client attribution, and access.

204. Each Defendant was aware of the essential nature and scope of the Enterprise and knew the Enterprise's affairs were conducted through a pattern of racketeering activity, including acts of mail fraud, wire fraud, witness tampering in violation of 18 U.S.C. § 1512(b), and retaliation against a witness or informant in violation of 18 U.S.C. § 1513(e), and agreed to facilitate or further those activities through coordinated use of Enterprise-controlled systems and communications.

205. The agreement encompassed use of Enterprise-controlled systems to centralize compensation routing, client access, lead allocation, and escalation handling, and to implement decisions affecting commission attribution and system access.

206. Defendants agreed to the commission of predicate acts described in Count I and the Predicate Acts Table, including the diversion, withholding, misattribution, rerouting, delay, suppression, or blocking of commissions and compensation opportunities attributable to Plaintiff's originated clients and identifiable client engagements, and the concealment of material compliance information, and the coordinated restriction of Plaintiff's access to income-producing

systems following protected disclosures, and each Defendant agreed that at least one member of the conspiracy would commit such acts in furtherance of the Enterprise's affairs.

207. In furtherance of the conspiracy, Defendants committed overt acts, including coordinating interstate communications; enforcing Enterprise-wide directives affecting compensation and client ownership; minimizing or suppressing compliance escalation; and effectuating Plaintiff's removal from Enterprise systems and opportunities.

208. Defendants authorized, facilitated, or failed to prevent racketeering acts committed by co-participants while possessing authority over Enterprise-controlled systems that enabled such acts.

209. Each Defendant is liable for the acts of every other Defendant committed in furtherance of the conspiracy, regardless of whether each Defendant personally committed every racketeering act, because such acts were reasonably foreseeable and within the scope of the unlawful agreement.

209A. The commission diversion, access restrictions, and reassignment of Plaintiff-originated client relationships were reasonably foreseeable consequences of the coordinated use of Enterprise systems and escalation-containment practices described herein and fell within the scope of the agreement among Defendants.

210. Each Defendant participated in the operation or management of the Enterprise itself and not merely in routine employment or agency activity. Their conduct included directing commission-routing and attribution decisions, controlling access to Enterprise systems and communication channels, shaping responses to compliance escalation, and participating in interstate communications used to implement or maintain the diversion and reassignment of Plaintiff-generated commissions and client relationships. These actions reflect decision-making

83

authority and operational involvement in the Enterprise's income-producing systems and escalation-handling processes.

211. As a direct and proximate result of Defendants' RICO conspiracy, Plaintiff suffered injury to his business and property within the meaning of 18 U.S.C. § 1964(c), including diverted commissions, loss of future income, destruction of business expectancy, and exclusion from Enterprise-controlled economic opportunities.

212. Defendants' conduct was knowing and willful, entitling Plaintiff to all relief available under 18 U.S.C. § 1964, including treble damages, costs, and appropriate equitable relief.

## COUNT III
## FAIR LABOR STANDARDS ACT - LABOR MISCLASSIFICATION
### 29 U.S.C. § 201 et seq.
(Against All Defendants)

213. Plaintiff incorporates the preceding paragraphs relevant to this Count, only to the extent necessary to state this claim.

214. At all relevant times, Defendants were "employers" within the meaning of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203(d), and Plaintiff was an "employee" within the meaning of 29 U.S.C. § 203(e), notwithstanding Defendants' characterization of Plaintiff as an "independent contractor."

215. Defendants jointly employed Plaintiff within the meaning of the FLSA. The Corporate Defendants exercised centralized control over recruitment, training, compensation systems, lead distribution, performance expectations, and termination authority, while Individual Defendants exercised direct and indirect supervisory authority over Plaintiff's work and economic opportunities. Under the Economic Realities Test, these Defendants functioned as joint employers by exercising shared control over Plaintiff's work, compensation, scheduling, continued access to

84

income-producing systems, CRM access, scheduling permissions, lead distribution, appointment routing, and unilateral authority to suspend or terminate system access and compensation pathways, as described in ¶¶ 217–223.

215A. These Defendants exercised centralized control over mandatory Enterprise systems governing scheduling, client routing, lead distribution, and compensation allocation, and possessed the authority to suspend or terminate Plaintiff's access to those systems. Such authority constitutes functional control over the manner and means of Plaintiff's work and supports joint employer status under the Economic Realities Test.

216. Defendants misclassified Plaintiff as an independent contractor while treating him, in practice and operation, as an employee economically dependent upon the Enterprise, in violation of the FLSA.

## A. Degree of Control

217. Defendants exercised control over Plaintiff's work, including mandatory training calls, required use of Enterprise-controlled CRM and scheduling systems, requirements that Plaintiff prepare and deliver standardized and advanced-markets sales scripting for Enterprise use, lead-routing restrictions, approval requirements, pricing limitations, and compliance directives enforced through Enterprise platforms and contractual policies under Defendants' unilateral control. Defendants further required Plaintiff, in connection with Enterprise-directed training sessions including the "Wealth with Walter" series, to generate scripting content and related sales-process questions for dissemination to Enterprise agents through Enterprise leadership channels.

218. Defendants further exercised control over Plaintiff's time and working conditions by requiring attendance at mandatory morning Zoom meetings, directing Plaintiff's availability

throughout the workday and evening hours, and instructing Plaintiff to remove scheduling buffers between client meetings – at times during live Zoom calls – thereby directing the pace, sequencing, and duration of Plaintiff's work in a manner inconsistent with independent business ownership.

219. Defendants required Plaintiff to remain continuously available beyond standard working hours, including nights, weekends, and holidays, and to participate in Enterprise-directed activities at times dictated by Enterprise scheduling, training, and client demands. Plaintiff routinely worked in excess of ninety (90) hours per week performing mandatory meetings, client appointments, documentation preparation, compliance review, and real-time communications through Enterprise-controlled systems.

219A. During one or more representative workweeks within the relevant limitations period, Plaintiff worked well in excess of forty (40) hours per week performing Enterprise-directed activities. Plaintiff's compensation structure was commission-based rather than hourly wages; however, due to the diversion, withholding, suppression, and rerouting of commissions and income pathways through Enterprise-controlled systems as alleged herein, Plaintiff received no net compensation for those representative workweeks (or compensation effectively reduced below the federal minimum wage when allocated across required hours) and received no overtime premium for hours worked over forty (40), as required by 29 U.S.C. §§ 206 and 207. Plaintiff's hours, required participation, and work cadence are reflected in Enterprise calendars, meeting attendance records, scheduling systems, and communications within Defendants' possession, custody, or control.

220. Plaintiff's workdays regularly began with mandatory morning Enterprise meetings between approximately 9:00 and 9:30 a.m. Central Time and frequently extended until late

86

evening or early morning hours, including calls from Enterprise agents on Saturday nights, Sunday afternoons and evenings, and weeknights – often involving Defendant Chris Leake – concerning Enterprise business, scripting, documentation, and transaction support.

221. Defendants tracked and directed these hours through Enterprise-controlled systems and required attendance while classifying Plaintiff as an "independent contractor" and failing to compensate all hours worked. These hours are corroborated by Enterprise calendars, attendance logs, and communication records within Defendants' possession.

221A. Defendants' Enterprise-controlled scheduling, communication, and related systems maintain the data necessary to calculate with precision the minimum-wage shortfall and overtime owed, including calendars, attendance logs, required meeting records, and internal communications reflecting required availability and workload. Those records will permit exact computation of unpaid wages, overtime, and liquidated damages, following discovery.

222. Defendants controlled Plaintiff's access to clients, compensation streams, carrier appointments, and internal calendars, including Plaintiff's designation and removal as a Subject Matter Expert ("SME"), thereby dictating Plaintiff's ability to generate income.

223. Defendants retained unilateral authority to discipline, suspend, restrict, or terminate Plaintiff's access to Enterprise systems and income-generating opportunities, which they exercised following Plaintiff's protected activity. Plaintiff's primary sales and income-generating work was performed through Enterprise-controlled digital systems, including Zoom, CRM platforms, and scheduling systems, and was materially dependent on Enterprise-controlled lead distribution, calendar placement, carrier-access permissions, and compensation routing. Plaintiff did not customarily and regularly perform sales activities away from Enterprise-directed systems in the manner contemplated by the outside-sales exemption. Plaintiff's ability to solicit, meet, and

87

transact with clients depended on continued Enterprise authorization and system access, rendering him economically dependent on Defendants' centralized platforms and control rather than operating an independent business, and was therefore not the type of independent, away-from-employer sales activity contemplated by the outside-sales exemption.

**B.     Economic Dependence**

224.     Plaintiff was economically dependent on Defendants' Enterprise for the opportunity to earn income and could not meaningfully operate an independent business without continued access to Enterprise-controlled systems governing client access, calendars, carrier relationships, and compensation.

225.     Although Defendants represented Plaintiff's role as offering "unlimited income potential," Plaintiff had no meaningful opportunity for profit or loss independent of Defendants' Enterprise-controlled constraints, because all revenue generation depended on Defendants' discretionary control over client access, calendars, client attribution, compensation routing, carrier access and continued system access.

226.     Plaintiff bore the risk of economic loss not through entrepreneurial decision-making, but through Defendants' unilateral actions – including removal from calendars, diversion of commissions, restriction of access, and reputational harm within Enterprise-controlled channels – which Plaintiff could not mitigate through independent business strategy, pricing discretion, or alternative market access.

227.     Any purported opportunity for profit was therefore not meaningfully realizable and entirely contingent upon Defendants' continued approval and support, while the risk of loss – including loss of income – was imposed by Defendants through Enterprise enforcement and retaliation, not market competition. These facts collectively demonstrate Defendants' pervasive

88

control over the manner, means, scheduling, compensation structure, and economic reality of Plaintiff's work.

227A. Defendants did not merely fail to pay Plaintiff wages or commissions; they required Plaintiff to incur substantial unreimbursed business expenses as a condition of continued participation in the Enterprise, including mandatory travel to Enterprise-directed training and "Advanced Markets" bootcamp events for which Plaintiff was required to purchase tickets from Defendants' affiliated entities and personally pay airfare, lodging, ground transportation, meals, and related costs. Plaintiff was never reimbursed for these expenses and, in effect, was required to pay out-of-pocket to perform work controlled by Defendants, while Defendants simultaneously exercised unilateral control over Plaintiff's client access, calendars, and compensation systems – facts that further demonstrate economic dependence, lack of entrepreneurial opportunity, and willful misclassification under the FLSA.

228. Plaintiff did not market services to the general public independent of Defendants, did not control pricing, and did not possess the ability to substitute services or freely expand operations outside Defendants' Enterprise framework.

C. **Lack of Entrepreneurial Opportunity**

229. Plaintiff had no meaningful opportunity for entrepreneurial profit or loss independent of Defendants' control. Any variation in Plaintiff's earnings was driven by Defendants' discretionary allocation of agent referrals, assignments, carrier access, calendar access, and continued system authorization, rather than by Plaintiff's independent managerial discretion, pricing authority, business strategy, or exposure to market competition. As further alleged below, Defendants' willful misclassification was not incidental, but systematic and undertaken with knowledge of the Fair Labor Standards Act's requirements.

89

230. Plaintiff could not hire sub-agents, set independent business strategy, negotiate compensation terms, or develop an autonomous client base free from Defendants' restrictions.

**D. Permanence and Integration**

231. Plaintiff's relationship with Defendants was not project-based or temporary, but instead reflected an ongoing, indefinite engagement integral to Defendants' core business operations.

232. Plaintiff's work – insurance sales, retirement planning support, and advanced markets strategies – was essential to Defendants' regular business and central to the revenue model promoted by the Enterprise.

**E. Skill and Independent Business Judgment**

233. Although Plaintiff possessed specialized skills and professional experience, those skills were deployed entirely within Defendants' controlled Enterprise and did not transform Plaintiff into an independent contractor under the FLSA.

234. The exercise of professional judgment within an employer-controlled system does not negate employee status where economic dependence and control predominate.

**F. FLSA Violations**

235. By misclassifying Plaintiff as an independent contractor, Defendants acted knowingly and failed to comply with their obligations under the FLSA, including but not limited to failing to pay wages owed, failing to maintain accurate compensation records, and depriving Plaintiff of statutory protections afforded to employees.

236. Defendants' misclassification was knowing and willful, as Defendants were aware of the degree of control exercised over Plaintiff and the economic realities of the relationship. Defendants' violations were willful within the meaning of 29 U.S.C. § 255(a), entitling Plaintiff to the extended three-year statute of limitations.

90

237. Following Defendants' retaliatory actions, Plaintiff experienced an abrupt and sustained loss of income-generating opportunities, including the cessation of inbound Enterprise-related business communications and referrals that had previously constituted Plaintiff's primary source of work, further demonstrating Plaintiff's economic dependence on Defendants' Enterprise and lack of any independent customer base or market access.

## G.    Damages

238. As a direct and proximate result of Defendants' FLSA violations, Plaintiff suffered lost wages, loss of statutory protections, economic harm, and other damages recoverable under 29 U.S.C. § 216(b).

239. Defendants' conduct was willful, entitling Plaintiff to liquidated damages, back pay, interest, attorneys' fees, and costs as permitted by law.

## COUNT IV
## NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES
### N.C. Gen. Stat. § 75-1.1 et seq.
(Against All Defendants)

240. Plaintiff incorporates the preceding paragraphs relevant to this Count, only to the extent necessary to state this claim.

241. At all relevant times, Defendants were engaged in trade or commerce within the meaning of N.C. Gen. Stat. § 75-1.1, including the recruitment of insurance professionals through standardized inducements, marketing of insurance and financial services to consumers, administration of Enterprise-controlled compensation and client-allocation systems, and operation of recruiting and consumer lead funnels affecting marketplace competition and consumers within and affecting North Carolina.

242. Defendants engaged in unfair and deceptive acts in or affecting commerce by disseminating recruiting representations regarding independence and compensation practices;

91

diverting earned commissions through Enterprise-controlled systems; and failing to disclose material facts concerning commission routing, licensure limitations, and Enterprise control. The conduct affected marketplace participants and consumers within and affecting North Carolina.

243. Defendants' unfair and deceptive acts were directed into, occurred within, or substantially affected North Carolina and proximately caused Plaintiff to suffer actual, measurable economic injury, including diverted commissions, lost business expectancy, and related financial harm. Defendants' unfair and deceptive acts were conceived, directed, approved, or implemented from North Carolina-based leadership and enterprise systems, satisfying the in-state impact, injury, and nexus requirements of N.C. Gen. Stat. § 75-1.1.

244. Pursuant to N.C. Gen. Stat. §§ 75-16 and 75-16.1, Plaintiff seeks treble damages, costs, attorneys' fees where permitted, and such other relief as the Court deems just and proper.

## COUNT V
## DODD-FRANK WHISTLEBLOWER RETALIATION
### *15 U.S.C. § 78u-6(h)*
(Against All Defendants)

245. Plaintiff incorporates the preceding paragraphs relevant to this Count, only to the extent necessary to state this claim.

246. The Dodd-Frank Wall Street Reform and Consumer Protection Act prohibits any employer from discharging, demoting, suspending, threatening, harassing, directly or indirectly, or in any other manner discriminating against a whistleblower because of any lawful act done by the whistleblower in providing information to the Securities and Exchange Commission ("SEC") or in making disclosures required or protected under federal securities laws. See 15 U.S.C. § 78u-6(h)(1)(A).

247. Plaintiff qualifies as a "whistleblower" within the meaning of 15 U.S.C. § 78u-6(a)(6), because he provided information, in good faith, directly to the Securities and Exchange

92

Commission through a formal Tip, Complaint, or Referral ("TCR") submission on or about June 23, 2025, and thereafter to other federal and state regulatory authorities, concerning conduct he reasonably believed constituted violations of federal securities laws, state securities laws, insurance regulations, and related anti-fraud provisions. Plaintiff's submission to the SEC preceded later adverse actions alleged herein, including continued system restrictions, continued diversion of compensation, and later decisions affecting Plaintiff's contractual relationship with Quility Insurance Holdings, LLC.

248. During his tenure within the Enterprise, Plaintiff identified and documented conduct raising serious regulatory and legal concerns, including but not limited to: unlicensed securities-adjacent activity; misrepresentations regarding credentials, assets under management, and advisory authority when compared against publicly available regulatory records reviewed contemporaneously by Plaintiff; suitability failures; and the diversion of commissions tied to such activity.

249. Plaintiff reported these concerns internally to senior Enterprise leadership and compliance-adjacent personnel, including Defendants with supervisory authority, prior to any adverse action being taken against him. Plaintiff's internal reports were met with minimization, deflection, and discouragement, rather than investigation or remediation, despite Defendants' exclusive control over the systems, personnel, and conduct at issue.

250. Plaintiff's protected disclosures preceded Defendants' adverse system restrictions and termination decisions. The timing of the restrictions and termination followed Plaintiff's reporting activity.

251. Defendants tolerated and failed to remediate hostile and demeaning treatment directed at Plaintiff during Enterprise events, including the bootcamp incident described in ¶¶ 100–104.

93

After Plaintiff later engaged in protected reporting activity, Defendants' continued tolerance of that hostile environment – together with the subsequent access restrictions, cancellations, and commission-routing actions – formed part of the pattern of adverse actions that followed.

252. Plaintiff's June 23, 2025 SEC submission preceded Defendants' subsequent adverse actions. Following that disclosure, Defendants implemented system restrictions affecting Plaintiff's access to income-producing Enterprise platforms, continued diversion of Plaintiff-generated commissions, and ultimately permitted or caused the cancellation of Plaintiff's Quility Insurance Holdings contracts weeks later, despite Plaintiff not having resigned from Quility and having requested only separation from the McManamon hierarchy.

253. Plaintiff's disclosures were based on contemporaneous knowledge, documentary evidence, and recorded communications obtained in the ordinary course of his work and were made for the purpose of preventing ongoing regulatory violations and protecting clients and the public.

## A. Defendants' Knowledge

254. Upon information and belief, Defendants with supervisory and system-control authority were aware of Plaintiff's SEC submission or impending regulatory escalation prior to the adverse actions alleged herein. That inference is supported by Plaintiff's internal escalation of securities-adjacent compliance concerns (including credential/registration discrepancies reflected in public regulatory records) to Enterprise leadership and platform-control personnel before the adverse actions occurred. Such knowledge may be inferred from contemporaneous communications, acknowledgments of compliance concerns, and the timing of subsequent restrictions. Defendants' knowledge of Plaintiff's protected reporting is further evidenced by contemporaneous communications urging Plaintiff not to escalate the matter externally and

94

offering informal remediation which Plaintiff alleges was intended to dissuade or prevent regulatory reporting.

255. On or about June 19, 2025, Defendant Lisa Kimbrell initiated a telephonic communication with Plaintiff regarding commission diversion and escalating compliance concerns. During that communication, she acknowledged that internal practices had caused the situation, characterized the circumstances as reflecting "greed," offered informal commission remediation which Plaintiff reasonably understood to be conditioned on silence, and urged Plaintiff not to escalate the matter or "talk to the wrong people." At the time of this communication, Plaintiff had already initiated and was preparing additional disclosures to federal and state regulators, rendering a regulatory inquiry pending or reasonably foreseeable to Defendants.

256. Defendant Lisa Kimbrell's statements during the June 19, 2025 call reflected actual knowledge of noncompliant commission practices, Enterprise exposure, and the need to prevent regulatory escalation, and were inconsistent with Defendants' subsequent minimization, denial, or recharacterization of the diversion and related misconduct.

257. The June 19 communication constituted an effort to contain and neutralize Plaintiff's compliance escalation through informal remediation promises and discouragement of external reporting, rather than lawful correction through Enterprise compliance channels.

258. In recorded communications and contemporaneous internal discussions, Defendants acknowledged Plaintiff's compliance objections, discussed the regulatory and enforcement implications of the conduct at issue, and expressed concern regarding Plaintiff's escalation outside Enterprise-controlled channels, evidencing knowledge, apprehension, and retaliatory intent, as reflected in contemporaneous communications and actions described herein.

## B. Adverse Actions

259. Shortly after Plaintiff engaged in protected whistleblower activity, Defendants subjected him to a series of materially adverse actions, including but not limited to:

a. Removal from Subject Matter Expert calendars and revenue-generating assignments;

b. Suspension or restriction of system access necessary to perform his role;

c. Interference with carrier relationships and client routing;

d. Withholding and diversion of earned commissions;

e. Termination and/or constructive discharge under pretextual circumstances;

f. Cancellation of Plaintiff's contracts with Quility Insurance Holdings, LLC weeks after Plaintiff filed his SEC TCR and whistleblower affidavit, despite Plaintiff not having resigned from Quility and having sought only separation from the McManamon hierarchy.

260. These actions would dissuade a reasonable employee or contractor from engaging in protected whistleblower activity.

## C. Causation

261. The temporal proximity between Plaintiff's protected disclosures and Defendants' adverse actions, together with the sequencing and uniformity of those actions, is reflected in contemporaneous communications and system actions described herein and provides an objective basis for Plaintiff's retaliation allegations.

262. Defendants' stated reasons for Plaintiff's removal and termination were inconsistent, unsupported by performance metrics, and contradicted by contemporaneous internal communications and prior acknowledgments of Plaintiff's value to the Enterprise.

263. Defendants' actions followed Plaintiff's protected disclosures and resulted in removal of access, reassignment of client relationships, loss of compensation, and later actions affecting

Plaintiff's contractual relationship with Quility Insurance Holdings, LLC. Plaintiff did not voluntarily resign from Quility and instead sought only separation from the McManamon hierarchy.

263A. Defendants acted with knowledge of Plaintiff's protected disclosures and thereafter implemented system restrictions and compensation-related decisions affecting Plaintiff's income and client access. Defendants also later permitted or caused the cancellation of Plaintiff's Quility contracts after Plaintiff's SEC submission, despite Plaintiff not having resigned from Quility and having declined reassignment into Lisa Kimbrell's hierarchy.

## D. Damages

264. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff suffered substantial economic and non-economic harm, including but not limited to lost income, loss of future earning capacity, reputational injury, and the loss of business expectancy.

265. Plaintiff is entitled to all relief available under 15 U.S.C. § 78u-6(h), including double back pay with interest, compensatory damages, litigation costs, and reasonable attorneys' fees. Plaintiff does not seek reinstatement. Instead, Plaintiff seeks front pay in lieu of reinstatement because reinstatement is impracticable and inequitable in light of Defendants' retaliation, constructive termination, and blacklisting conduct, with front pay, measured by the long-term earnings trajectory, benefits, and professional advancement Plaintiff would have reasonably realized absent Defendants' unlawful conduct, in an amount to be proven at trial.

## E. Willfulness

266. Defendants' violations of Dodd-Frank were willful and knowing, warranting the full measure of statutory relief.

## COUNT VI
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
(Against All Defendants)

267. Plaintiff incorporates the preceding paragraphs relevant to this Count, only to the extent necessary to state this claim.

268. Under North Carolina law, a claim for tortious interference with business expectancy arises where a defendant intentionally induces or causes a third party, without justification, to enter into or terminate or to refrain from entering into or to terminate a valid business relationship with the plaintiff, resulting in actual damage.

269. At all relevant times, Plaintiff had existing and prospective business relationships and business expectancies with multiple clients, including high-net-worth individuals and entities seeking advanced insurance, estate, annuity, retirement, and IRMAA-mitigation strategies developed and stewarded by Plaintiff, and relationships documented in Enterprise calendars, meeting notes, email communications, and text-message communications exchanged in the ordinary course of business.

270. These business relationships and expectancies were not speculative. They were concrete, identifiable, and supported by Plaintiff's documented role as a designated Subject Matter Expert ("SME"), his direct client communications, his development of proprietary strategies, and his ongoing participation in client-facing planning and execution.

270A. Plaintiff's business relationships and expectancies included active client engagements, scheduled planning meetings, and ongoing placement activity known to Defendants at the time of diversion. These expectancies were concrete, identifiable, and had determinable economic value based on Enterprise commission schedules and client planning already underway. These engagements were ongoing and identifiable at the time of Defendants' interference.

98

271. Among Plaintiff's business expectancies was a substantial, identifiable client engagement involving assets exceeding $150 million and complex multi-year income and estate planning, referred to within Enterprise communications as the "MACK" client. On or about May 29, 2025, in Orlando, Florida, during a dinner attended by Enterprise agents and leadership, Defendant Kyle Kimbrell publicly referenced this engagement and stated in substance, "Congratulations, Walter – you've landed the largest client in Symmetry's history." The statement was made in the presence of Enterprise leadership and personnel, including Defendant Tim Taylor Smith and other Enterprise participants. A contemporaneous photograph taken at the event depicts Plaintiff Witherell with Enterprise leadership and agents following this acknowledgment and is referenced herein as corroborative of Enterprise recognition of the engagement and Plaintiff's role in originating and developing the relationship (see Exhibit 30B.)

272. Plaintiff's client engagements frequently involved assets held in securities or brokerage accounts that Plaintiff was not licensed to advise upon. After raising this issue internally, Plaintiff was directed through Enterprise leadership channels to work with Defendant Tim Taylor Smith as the designated securities-related participant for such matters. Plaintiff had no ability to substitute another advisor and was required to coordinate implementation through Smith. During this period, implementation of multiple client transactions was delayed or prevented while Smith indicated that required state licensing remained pending, resulting in suspension or disruption of transactions that had otherwise been agreed to in principle with clients.

273. Following Plaintiff's preservation of the Mack relationship and Defendants' knowledge of Plaintiff's central, compliance-driven role, Defendants nevertheless intentionally and unjustifiably interfered with Plaintiff's business expectancies by, among other actions:

99

a. Removing Plaintiff from client communications, calendars, and planning processes without notice or justification;

b. Diverting or reassigning Plaintiff's clients and prospective clients to other Enterprise participants;

c. Facilitating or permitting unlicensed or unauthorized individuals to insert themselves into Plaintiff's client relationships;

d. Misrepresenting Plaintiff's role, authority, or standing within the Enterprise to third parties; and

e. Withholding, rerouting, or misappropriating commissions and compensation associated with Plaintiff's client relationships.

273A. The damages associated with this engagement are derived from identifiable policy structures, commission schedules, and historical placement data applied to comparable transactions within the Enterprise. Precise calculations will be confirmed through discovery of records within Defendants' control.

274. Defendants removed Plaintiff from client communications, reassigned client relationships, and altered compensation routing through Enterprise-controlled systems. These actions affected Plaintiff's existing and prospective business relationships.

275. Defendants communicated with Plaintiff regarding escalation and commission concerns and thereafter implemented actions affecting his client access and compensation.

276. As a direct and proximate result of Defendants' interference, Plaintiff lost substantial commissions tied to structured, client-approved transactions positioned for submission or funding and was further deprived of renewal interests and commission payments fixed by carrier

100

commission schedules upon placement and traceable through Enterprise attribution and remittance records.

277. The damage figures alleged herein are pleaded in good faith based on available information and reasonable calculation methods. Plaintiff will refine these figures following discovery of carrier records, commission routing data, and internal accounting systems within Defendants' possession, custody, or control.

278. Defendants acted intentionally and without justification, in that their interference was willful, and carried out with conscious disregard of Plaintiff's rights and legitimate business interests.

279. Defendants' conduct was a substantial factor in causing Plaintiff's injuries, and such injuries were the natural and foreseeable consequence of Defendants' interference with Plaintiff's business expectancies.

## COUNT VII
## UNJUST ENRICHMENT
(Against All Defendants)

280. Plaintiff incorporates the preceding paragraphs relevant to this Count. This claim is pleaded in the alternative to Plaintiff's breach of contract and statutory claims, and only to the extent the Court determines that no enforceable contract governs the diversion, retention, or misallocation of the compensation and benefits alleged herein.

281. Defendants knowingly received, retained, and benefitted from substantial monetary and non-monetary gains attributable to Plaintiff's originated clients, labor, expertise, and professional goodwill, including but not limited to diverted compensation opportunities, renewal interests, client relationships, proprietary methodologies, and Enterprise-generated goodwill derived directly from Plaintiff's work and standing.

101

282. Plaintiff conferred these benefits upon Defendants through his performance as a designated Subject Matter Expert, including developing and stabilizing high-value client relationships, originating and structuring advanced insurance and retirement strategies, and contributing proprietary IRMAA mitigation methodologies that were utilized by the Enterprise to generate revenue.

283. Defendants accepted and retained these benefits with full knowledge that Plaintiff was the originating professional responsible for the underlying client acquisition, strategic design, and revenue generation, and that Plaintiff reasonably expected to be compensated in accordance with Defendants' representations, established practices, and equitable principles.

284. Instead of compensating Plaintiff, Defendants wrongfully diverted commissions and associated economic benefits to themselves and to favored Enterprise participants, including individuals lacking proper licensure, while excluding Plaintiff from compensation streams, client access, and renewal rights tied directly to his work.

285. Defendants' retention of these benefits was inequitable because it was accomplished through misuse of Enterprise-controlled systems, concealment of material facts, and exclusion following Plaintiff's protected activity, rather than through lawful competition or negotiated reallocation.

286. As a direct and proximate result of Defendants' conduct, Defendants were enriched at Plaintiff's expense through the diversion of identifiable commissions and related compensation generated by Plaintiff-originated client relationships. Based on presently available information and reasonable calculation methods, facts demonstrate diverted first-year commissions in an amount estimated to exceed approximately $5.6 million. Plaintiff further alleges additional renewal-related losses that are contract-based and objectively computable from carrier

commission schedules, in-force records, and remittance data. Applying those schedules to Plaintiff-originated client relationships, and assuming continuation subject to objective contingencies reflected in carrier records, Plaintiff estimates the ten-year renewal component at approximately $20.9 million, to be confirmed and precisely traced through discovery of carrier statements, Enterprise routing and attribution data, and related records within Defendants' possession, custody, or control. These losses flowed directly from Defendants' routing, attribution, and access-control decisions and did not depend on independent third-party actions.

287. Equity and good conscience require restitution because Defendants' enrichment was obtained not only at Plaintiff's expense, but through conduct intended to appropriate Plaintiff's labor and client relationships while simultaneously disabling his ability to earn or recover the associated compensation through Enterprise-controlled mechanisms.

288. Plaintiff has no adequate remedy at law to recover the full scope of Defendants' unjust gains, including concealed or internally rerouted compensation, absent equitable intervention by this Court.

289. Plaintiff is therefore entitled to restitution, disgorgement of unjustly retained benefits, and such further equitable relief as the Court deems just and proper, including the imposition of a constructive trust over all commissions, fees, renewals, and economic benefits derived from Plaintiff's work and wrongfully retained by Defendants.

## COUNT VIII
### CIVIL CONSPIRACY
(Against All Defendants)

290. Plaintiff incorporates the preceding paragraphs relevant to this Count, only to the extent necessary to state this claim.

291. At all relevant times, Defendants entered into a mutual understanding and agreement – express and implied – to accomplish unlawful objectives, including the diversion and retention of

103

Plaintiff's earned compensation, suppression of compliance escalation, misappropriation of Plaintiff's client relationships and proprietary strategies, and retaliation against Plaintiff for engaging in protected activity. The conspiracy alleged herein is predicated upon and results in independently actionable underlying torts and statutory violations, including fraud, conversion, tortious interference, retaliation, and violations of federal and state law. Each Defendant knowingly participated in this agreement with the intent to accomplish its objectives and the conduct alleged herein.

292. Defendants shared a common purpose and mutual understanding to: **(a)** divert and retain Plaintiff Witherell's earned commissions; **(b)** suppress, minimize, or conceal unlicensed advisory activity and compliance failures; **(c)** misappropriate Plaintiff Witherell's proprietary strategies and client relationships; and **(d)** retaliate against Plaintiff Witherell for engaging in protected reporting and compliance escalation.

293. The existence of the conspiratorial agreement is evidenced by Defendants' coordinated conduct, including synchronized communications, shared access to Enterprise-controlled systems, joint decisions affecting Plaintiff's compensation and access, and uniform enforcement actions taken against Plaintiff following his protected disclosures.

294. In furtherance of the conspiracy, Defendants committed multiple overt acts, including but not limited to: **(a)** re-routing commissions through Enterprise-controlled compensation systems; **(b)** misrepresenting Plaintiff Witherell's status and compensation internally and externally; **(c)** excluding Plaintiff Witherell from client communications and scheduling systems; **(d)** discouraging or obstructing regulatory reporting; and **(e)** orchestrating adverse actions following Plaintiff Witherell's protected disclosures.

295. Defendants' conduct involved coordinated actions affecting compensation routing, client attribution, and system access through Enterprise-controlled platforms.

296. As a direct and proximate result of Defendants' civil conspiracy, Plaintiff Witherell suffered substantial damages, including but not limited to: lost commissions, lost future renewal income, destruction of business expectancy, reputational harm, emotional distress, and economic exclusion from Enterprise-controlled opportunities.

297. Defendants' concerted conduct was undertaken willfully, and with knowledge of or reckless disregard for Plaintiff Witherell's rights as reflected in the contemporaneous communications, compensation routing actions, and escalation-suppression conduct described herein, rendering them jointly and severally liable for all damages resulting from the conspiracy.

298. Plaintiff Witherell is entitled to recover compensatory damages, consequential damages, equitable relief, costs, and such other relief as the Court deems just and proper as a result of Defendants' civil conspiracy.

## COUNT IX
## FRAUD AND FRAUDULENT CONCEALMENT
(Against All Defendants)

299. Plaintiff incorporates the preceding paragraphs relevant to this Count, only to the extent necessary to state this claim.

300. Plaintiff alleges with particularity the who, what, when, where, and how of Defendants' fraudulent conduct, including the individuals who made or ratified the misrepresentations, the content and timing of the statements and omissions, the interstate channels used, and the facts concealed within Defendants' control. These allegations are supported by representative communications, recordings, emails, calendar confirmations, and system records identifying speakers, timing, and channels, with additional particularized instances available for each category of conduct and to be produced in discovery.

301. At all relevant times, Defendants made material misrepresentations and omissions of fact to Plaintiff concerning the nature of the Enterprise, the legality of its operations, the licensing status of individuals directing client strategy, the ownership and routing of Plaintiff's commissions, and the existence of meaningful compliance oversight.

302. Defendants' misrepresentations were conveyed through interstate communications, including recruiting videos, training calls, Enterprise-approved scripts, emails, internal messaging platforms, recorded Zoom meetings, and client-facing materials disseminated nationwide.

303. Defendants represented, directly and indirectly, that: **(a)** Plaintiff was operating an independent business with autonomy over client relationships and compensation; **(b)** commissions generated by Plaintiff's work would be properly credited, paid, and preserved; **(c)** individuals presented as advanced-markets or strategy specialists were properly licensed and authorized; and **(d)** compliance concerns would be reviewed and remediated in good faith through Enterprise channels.

304. The representations described above were materially misleading in light of undisclosed facts concerning centralized control over commissions, client ownership, lead routing, and licensure limitations.

305. The omitted information concerning licensing scope and compensation control was material to Plaintiff's decision to continue participation and introduce client relationships.

306. Defendants knowingly concealed facts within their exclusive control, engaging in coordinated efforts to hide internal decisions to reassign client ownership, reroute commissions, suppress compliance reporting, permit unlicensed advisory activity, and retain economic benefits generated by Plaintiff's labor.

307. Defendants had a duty to disclose material facts arising from their superior knowledge, exclusive control over compensation and client systems, and affirmative representations inviting Plaintiff's reliance.

308. Defendants made representations concerning compensation handling, licensing status, and compliance oversight while Plaintiff continued generating business and introducing client relationships.

309. Plaintiff continued performing services and introducing client relationships in reliance on those representations. Compensation was later diverted or withheld through Enterprise-controlled systems.

310. Defendants' fraudulent conduct was carried out with knowledge of its falsity or, at minimum, with reckless disregard for the truth as reflected in the communications, internal responses, and corrective omissions described herein, and was intended to induce reliance by Plaintiff for Defendants' financial benefit.

311. As a direct and proximate result of Defendants' fraud and fraudulent concealment, Plaintiff suffered substantial injury to his business and property, including diverted commissions, loss of future earning capacity, destruction of business expectancy, and other economic losses proximately caused by the fraud.

312. The conduct alleged herein occurred across multiple communications and transactions involving Enterprise systems and was not limited to a single instance.

313. Defendants are jointly and severally liable for all damages resulting from their fraudulent conduct, and Plaintiff is entitled to all available legal and equitable relief.

314. Defendants' conduct satisfies the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), as Plaintiff has alleged with particularity the nature of the

107

misrepresentations, the channels through which they were transmitted, the facts concealed, the parties responsible, and the resulting harm. Defendants' fraud was repeated, coordinated, and embedded in standardized Enterprise practices rather than isolated misstatements, satisfying Rule 9(b) as applied to the circumstances pleaded herein.

314A. The particularized allegations set forth above are pleaded based on Plaintiff's personal knowledge, contemporaneous records, and preserved communications, and provide Defendants with sufficient notice of the specific misrepresentations, omissions, speakers, timing, and mechanisms at issue to enable a meaningful response under Federal Rule of Civil Procedure 9(b).

## COUNT X
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
(Against All Defendants)

315. Plaintiff incorporates the preceding paragraphs relevant to this Count, only to the extent necessary to state this claim.

316. At all relevant times, certain Defendants and Enterprise participants (the "Primary Fiduciaries") exercised discretionary authority and control over identifiable funds, commissions, client relationships, and compensation systems in which Plaintiff held vested economic interests, giving rise to fiduciary duties under applicable law.

317. These fiduciary duties included duties of loyalty, honesty, good faith, fair dealing, and full disclosure, and arose from Defendants' superior knowledge and discretionary authority over Plaintiff's commissions, client ownership, regulatory compliance, and professional standing.

318. These fiduciary duties arose from Defendants' discretionary control over identifiable commissions, client attribution, carrier access, and Enterprise-controlled compensation systems, together with authority to reassign, withhold, or divert specific funds and economic interests entrusted to their administration. This fiduciary-duty theory is pleaded in the alternative and arises from Defendants' discretionary control over identifiable funds and economic interests

108

entrusted to their administration rather than merely from contractual labels or independent-contractor status.

318A. Plaintiff does not rely on the existence of a traditional employer-employee fiduciary relationship, but on Defendants' discretionary authority over Plaintiff's earned commissions, client relationships, and compensation streams, which were placed within Defendants' control and subject to their allocation decisions, giving rise to duties of loyalty and full disclosure under applicable law.

319. Plaintiff does not allege a fiduciary duty arising merely from contractual status, but from Defendants' exclusive control over identifiable funds, discretionary authority over Plaintiff's economic interests, and assumption of fiduciary administrative functions ordinarily requiring loyalty and full disclosure.

320. The Primary Fiduciaries exercised discretionary control over identifiable commissions, client attribution, and compensation systems and engaged in diversion, reassignment, and concealment affecting Plaintiff's economic interests.

321. Defendants other than the Primary Fiduciaries had actual knowledge of these fiduciary breaches, or at minimum knowledge of facts and circumstances making the breaches obvious, including internal communications, recorded calls, acknowledgments of commission diversion, licensing concerns, and repeated assurances that remediation would occur while diversion continued.

322. Defendants knowingly and substantially assisted the Primary Fiduciaries by providing access to, and enforcing the use of, Enterprise-controlled systems that enabled commission diversion, client reassignment, suppression of compliance escalation, and retaliatory exclusion, conduct without which the fiduciary breaches could not have been successfully carried out.

109

323. Defendants' assistance was a proximate cause of Plaintiff's injuries because it operationalized the fiduciary breaches through centralized control mechanisms that deprived Plaintiff of compensation, client access, and economic opportunity while shielding the misconduct from detection or remediation.

324. Defendants knew that their conduct would materially assist the fiduciary breaches and acted intentionally, willfully, or with conscious disregard for Plaintiff's rights and economic interests.

325. As a direct and proximate result of Defendants' aiding and abetting of fiduciary breaches, Plaintiff suffered concrete injury to his business and property, including diverted commissions, loss of renewal and residual income, destruction of identifiable business expectancies, reputational harm, and economic exclusion from Enterprise-controlled opportunities.

326. Defendants are jointly and severally liable for all damages proximately caused by the fiduciary breaches they aided and abetted, including compensatory damages, disgorgement of ill-gotten gains, prejudgment interest, and such other legal or equitable relief as the Court deems just and proper.

326A. Pleaded in the alternative, the conduct described herein also constitutes knowing participation in, and substantial assistance to, unlawful diversion, concealment, and retention of identifiable funds and business interests sufficient to support Plaintiff's equitable claims for accounting, disgorgement, restitution, and constructive trust.

## COUNT XI
## CONVERSION / MISAPPROPRIATION OF COMMISSIONS
(Against All Defendants)

327. Plaintiff incorporates the preceding paragraphs relevant to this Count, only to the extent necessary to state this claim.

110

328. At all relevant times, Plaintiff possessed a clear, vested, and legally cognizable property interest in commissions, renewal commissions, overrides, and related compensation generated from client relationships that Plaintiff originated, developed, serviced, and advanced through substantial professional labor, expertise, and goodwill.

329. These commissions and compensation interests constituted specific, identifiable economic interests capable of precise calculation and tracing through Defendants' internal attribution, routing, calendar/CRM, carrier-interface, and allocation systems under Defendants' control, including records reflecting client assignment, commission-routing decisions, internal payment ledgers, and transaction-status tracking, and were identifiable at the time of diversion or blocking through Enterprise-controlled processes.

330. Defendants knowingly and intentionally exercised wrongful dominion and control over Plaintiff's commission-based compensation interests by, among other acts, diverting or rerouting attribution, reassigning client ownership, altering internal routing and allocation decisions, withholding or suppressing compensation recognition, and allocating Plaintiff's commission opportunities and related economic benefits to themselves or to favored Enterprise participants.

331. Defendants' control over Plaintiff's commissions was unauthorized, exceeded any contractual or equitable entitlement, and was inconsistent with Plaintiff's ownership rights in compensation generated by his labor and client relationships.

332. Defendants exercised control over identifiable commissions through internal routing and allocation systems and retained or redirected those funds despite Plaintiff's claim of entitlement.

332A. The commissions and related compensation at issue constitute identifiable funds capable of being traced through carrier commission statements, chargeback ledgers, remittance advices, and Enterprise commission-routing records maintained in the ordinary course of business; the

111

amounts diverted are determinable from those same records, which are within Defendants'
possession or control.

333.    After discovering the misappropriation, Plaintiff demanded reconciliation and payment of
the diverted commissions, including through direct communications with Defendants who
acknowledged the existence of "commission confusion" and represented that remediation would
occur.

334.    Defendants refused, failed, or intentionally delayed payment, instead providing false
assurances, shifting explanations, or silence, while continuing to retain, distribute, or benefit from
Plaintiff's commissions.

335.    As a direct and proximate result of Defendants' conversion, Plaintiff suffered substantial
economic harm, including loss of earned commissions, loss of renewal and residual income,
destruction of business value, and consequential damages.

336.    Defendants' conversion was willful, knowing, and undertaken in conscious disregard of
Plaintiff's rights, entitling Plaintiff to compensatory damages, disgorgement, prejudgment
interest, and all other relief available at law and in equity.

337.    Defendants hold the converted commissions and all traceable proceeds as constructive
trustees for Plaintiff's benefit and must disgorge all wrongfully retained amounts, together with
interest and any accretions thereon.

## COUNT XII
## ACCOUNTING AND CONSTRUCTIVE TRUST
(Against All Defendants)

338.    Plaintiff incorporates the preceding paragraphs relevant to this Count, only to the extent
necessary to state this claim.

## A. Inadequacy of Legal Remedy

339. Defendants exercised exclusive control over the systems, records, commission-routing mechanisms, algorithms, and internal allocation processes governing the calculation, payment, reassignment, withholding, and diversion of commissions and renewal income attributable to Plaintiff's business.

340. The precise amounts of commissions, renewals, and related compensation cannot be determined without access to Defendants' internal records and carrier statements, which are solely within Defendants' possession, custody, or control.

341. Commission routing, allocation, and internal reassignment processes were not fully disclosed to Plaintiff, and the precise amounts attributable to Plaintiff cannot be determined without access to Defendants' records.

341A. Upon information and belief, Defendants and their affiliated entities possess exclusive access to the carrier statements, routing records, commission ledgers, and internal allocation systems necessary to determine the full amount of compensation attributable to Plaintiff's work, including records reflecting how diverted funds were allocated, withheld, or reassigned within Enterprise-controlled systems.

## B. Duty to Account

342. Defendants owed Plaintiff a duty to account arising from their exclusive control over systems and records governing commissions, renewals, and other compensation attributable to Plaintiff-originated client engagements and transactions that were delayed, blocked, or reassigned through Enterprise-controlled processes.

113

343. This duty further arose from Defendants' superior access to material information, their representations that compensation issues would be reconciled, and their discretionary authority over the systems governing attribution, payment, and retention of Plaintiff's earnings.

344. Defendants breached this duty by failing to provide a full, accurate, and transparent accounting of all compensation generated by Plaintiff, while continuing to retain, distribute, conceal, or misallocate funds traceable to Plaintiff's business.

**C.      Constructive Trust**

345. Defendants retained commissions and related compensation through internal routing and allocation systems following reassignment and exclusion of Plaintiff from Enterprise-controlled platforms.

346. Equity and good conscience require the imposition of a constructive trust over all funds, proceeds, renewals, overrides, residual income, and other benefits traceable to Plaintiff's diverted commissions, wherever located and however held.

347. Defendants hold such funds as involuntary trustees for Plaintiff's benefit and must disgorge all amounts wrongfully retained, together with any interest, accretions, or derivative benefits earned thereon.

**D.      Relief Sought**

348. Plaintiff seeks an order requiring Defendants to render a full and complete accounting of all compensation attributable to Plaintiff's business, including but not limited to commissions, renewals, overrides, fees, reallocations, routing changes, and internal adjustments.

349. Plaintiff further seeks the imposition of a constructive trust over all traceable funds and an order compelling disgorgement and restitution of all amounts wrongfully retained, with prejudgment interest.

350. Plaintiff seeks such additional equitable relief as the Court deems just and proper to prevent further unjust enrichment and to restore Plaintiff to the position he would have occupied absent Defendants' misconduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Walter David Witherell II respectfully requests that this Court enter judgment in his favor and against Defendants, jointly and severally, and award the following relief:

### A. RICO Relief (18 U.S.C. § 1964)

351. Entering judgment in favor of Plaintiff on Count I (RICO) and Count II (RICO Conspiracy) and awarding all relief authorized under 18 U.S.C. § 1964, including treble damages, costs, and reasonable attorneys' fees where permitted, for injuries to Plaintiff's business or property proximately caused by Defendants' violations of 18 U.S.C. §§ 1962(c) and (d). Plaintiff's claims arise from injury to business or property within the meaning of 18 U.S.C. § 1964(c), including the diversion of identifiable commissions, renewal streams, and economic interests traceable through Defendants' enterprise-controlled systems.

### B. Compensatory Damages

352. Awarding Plaintiff compensatory damages in an amount to be proven at trial, including but not limited to: **(a)** diverted and unpaid commissions; **(b)** lost renewal and residual income; **(c)** destruction of business expectancy and enterprise goodwill; and **(d)** loss of earning capacity proximately caused by Defendants' conduct.

**C.    Disgorgement, Restitution, and Unjust Enrichment**

353.    Ordering Defendants to disgorge and restore all commissions, fees, profits, benefits, and other proceeds wrongfully obtained at Plaintiff's expense, including all amounts traceable to Plaintiff's originated clients, strategies, work product, and Enterprise contributions.

**D.    Accounting**

354.    Compelling Defendants to render a full accounting of all compensation attributable to Plaintiff's business, including commissions, renewals, overrides, fees, reallocations, routing changes, and internal adjustments affecting Plaintiff's clients and income.

**E.    Constructive Trust**

355.    Imposing a constructive trust over all funds, proceeds, renewals, residual income, and other benefits wrongfully diverted from Plaintiff, wherever located and however held, together with all interest and accretions thereon.

**F.    Injunctive and Equitable Relief**

356.    Granting such injunctive or equitable relief as may be available under applicable law, including preliminary and permanent relief prohibiting Defendants from continuing to interfere with Plaintiff's business relationships, misusing or exploiting Plaintiff's proprietary materials, concealing or diverting compensation through Enterprise-controlled systems, or engaging in retaliatory conduct arising from Plaintiff's protected activity, directly or indirectly, including through agents or third parties.

**G.    Declaratory Relief**

357.    Issuing declaratory relief pursuant to 28 U.S.C. §§ 2201–2202 clarifying the parties' respective rights and obligations concerning commission ownership, client attribution,

compensation routing, and enterprise control mechanisms, so as to prevent ongoing and future harm.

**H.** **Statutory and Liquidated Damages (Where Applicable)**

358. Awarding all statutory, liquidated, enhanced, and double damages available under applicable federal and state law, including but not limited to remedies authorized by the Fair Labor Standards Act, Dodd-Frank Wall Street Reform and Consumer Protection Act, and state statutory causes of action proven at trial.

**I.** **Prejudgment and Post-Judgment Interest**

359. Awarding prejudgment and post-judgment interest as permitted by law to fully compensate Plaintiff for the loss of use of wrongfully withheld funds.

**J.** **Costs and Fees (Where Authorized)**

360. Awarding Plaintiff taxable costs, litigation expenses, and attorneys' fees to the extent authorized by statute or equity, including fees recoverable under 18 U.S.C. § 1964(c) and other applicable provisions of law.

**K.** **Punitive / Exemplary Damages (Where Permitted)**

361. Awarding punitive or exemplary damages to the extent permitted under applicable state law for willful, wanton, malicious, or oppressive conduct proven at trial.

**L.** **Other and Further Relief**

362. Granting such other and further legal or equitable relief as the Court deems just and proper.

<u>**EXHIBITS & RELEVANT ATTACHMENTS**</u>

<u>**GLOBAL EXHIBIT PRINCIPLES (DD-Global-1)**</u>

All exhibits attached to or referenced in this Complaint are offered solely to document the existence, timing, authorship, receipt, routing, appearance, and content of the communications or materials described, and not for the truth of any statements contained therein, except where expressly incorporated into Plaintiff's substantive allegations. Plaintiff has limited exhibits at this stage to representative materials sufficient to establish notice, knowledge, control, and pattern, and does not intend the present exhibit list to reflect the full universe of evidence discoverable in this action. Plaintiff expressly reserves the right to supplement, amend, and expand the evidentiary record through discovery, including by producing additional recordings, transcripts, documents, and materials within Defendants' possession, custody, or control, consistent with the Federal Rules of Civil Procedure and the Court's scheduling orders. Nothing herein is intended to limit Plaintiff's rights under Fed. R. Civ. P. 26, 34, or 45. Plaintiff does not rely on any single exhibit to establish liability; liability is pleaded independently through factual allegations satisfying Fed. R. Civ. P. 8 and, where applicable, Rule 9(b).

<u>**SEALED / CONFIDENTIAL MATERIALS (DD-Global-2)**</u>

Exhibits containing personal identifiers, whistleblower submissions, non-public regulatory materials, audio/video recordings, proprietary data, or sensitive information will be submitted under seal or with appropriate redactions pursuant to Fed. R. Civ. P. 5.2 and the Court's applicable sealing procedures and Local Rules, together with any motion or application required.

<u>**DEMONSTRATIVE-IMAGE NOTICE (DD-Global-3)**</u>

Any screenshots, photographs, or demonstrative images are included to accurately depict what was displayed, transmitted, posted, or represented on the stated date(s). Plaintiff offers such

118

materials to show the fact, context, and content of what was presented or communicated. Cultural and demonstrative exhibits are pleaded solely to establish knowledge, opportunity, association, and state of mind, not to prove the truth of any celebratory or promotional statements.

**EXHIBIT LIST**

(Filing under seal noted where applicable. Lettered sub-exhibits denote related materials under a single evidentiary category.)

## I.     ENTERPRISE STRUCTURE, RECRUITMENT, AND CONTROL

**EXHIBIT 1:** Enterprise recruiting posting(s) and/or recruiting portal screenshots used to solicit insurance agents (including any LinkedIn job posting(s) associated with the Kimbrell master-agency channel). (Recruiting inducement; interstate communications.)

**EXHIBIT 2:** Independent Contractor Agreement and related onboarding acknowledgments between Plaintiff and Defendants and/or their affiliated entities. (Control terms; misclassification; routing/ownership provisions.)

**EXHIBIT 3:** Recruiting/promotional video(s) disseminated by Defendants (including "Power Your Career with Symmetry" and similar enterprise recruiting media). (Standardized recruiting representations; interstate recruitment.)

**EXHIBIT 4:** Promotional video(s) and/or public marketing content describing enterprise scale and operational control features. (Enterprise messaging; inducement; interstate communications.)

**EXHIBIT 5:** Quility/Symmetry agent handbook and/or policies (selected excerpts). (Mandatory systems; discipline/control; required channels.)

**EXHIBIT 6:** Internal hierarchy display(s), team structure screenshot(s), and/or organization chart(s) reflecting reporting structure and enterprise relationships. (Enterprise organization and

119

control.)

**EXHIBIT 7:** Enterprise calendar/HQ screenshot(s) listing Plaintiff as SME and/or assigning enterprise functions. (Integration; reliance; control.)

**EXHIBIT 8:** Onboarding emails, system-access emails, and/or internal "how-to" directives reflecting mandatory platforms for lead intake, scheduling, CRM, and internal communications. (Operational control; economic dependence.)

## II.    COMPLIANCE FAILURE, UNLICENSED ACTIVITY, AND ENTERPRISE DEFLECTION

**EXHIBIT 9:** Audio recording of June 10, 2025 nationwide Zoom meeting including statements by Defendant McManamon regarding Plaintiff's "commission confusion," and related context. (To be submitted under seal with appropriate motion and order.) (Admissions; deflection; retaliation precursor.)

**EXHIBIT 10:** Audio recording and transcript of June 19, 2025 call between Plaintiff and Defendant Lisa Kimbrell concerning commission diversion and discouragement of regulatory escalation. (To be submitted under seal with appropriate motion and order.) (Admissions; obstruction/retaliation evidence.)

**EXHIBIT 11:** Group texts and/or internal message threads involving Plaintiff and Defendant Tim Taylor Smith ("TS") concerning licensing scope and related issues (including June 2025 threads). (To be submitted under seal with appropriate motion and order.) (Notice/knowledge; licensing deficiencies.)

**EXHIBIT 12:** Recorded call(s) or national training call(s) containing unlicensed advisory statements and/or enterprise dissemination of advanced-markets directives (including July 15, 2025 national call if applicable). (To be submitted under seal with appropriate motion and order.)

120

(Enterprise-wide dissemination; interstate nexus.)

**EXHIBIT 13:** Email thread(s) with Defendant Smith and QFA personnel concerning brokerage-account solicitation and/or securities-adjacent activity (including June 3, 2025 thread if applicable). (To be submitted under seal with appropriate motion and order.) (Securities-adjacent solicitation; compliance exposure.)

**EXHIBIT 14:** SEC IAPD/ADV screenshot(s) and public registration/formation materials reflecting QFA entity details. (Public filing; entity corroboration.)

**EXHIBIT 15:** Client-facing event registration page(s), profile page(s), or web marketing page(s) reflecting claimed AUM/credentials/authority attributed to Defendant Smith. (Inducement; misrepresentation.)

## III. COMMISSION DIVERSION, BUSINESS MISAPPROPRIATION, AND DAMAGES

**EXHIBIT 16:** Audio recording(s) documenting alleged misuse of Plaintiff's proprietary materials and/or client strategy work product (May 2025 and related). (To be submitted under seal with appropriate motion and order.) (Misappropriation; unfair benefit.)

**EXHIBIT 17:** Audio recording dated May 29, 2025 (or other applicable date) reflecting Defendant Smith soliciting a high-premium transaction while allegedly outside proper licensure jurisdiction and/or while using enterprise channels. (To be submitted under seal with appropriate motion and order.) (Predicate-act evidence; nexus.)

**EXHIBIT 18:** Recording and transcript of Plaintiff's June 13, 2025 termination/retaliation meeting (or functional equivalent). (To be submitted under seal with appropriate motion and order.) (Adverse action; causation; pretext.)

**EXHIBIT 19:** CRM screenshots, commission portal screenshots, routing screenshots, and/or internal allocation records showing diversion/misattribution of commissions. (To be submitted

121

under seal with appropriate motion and order.) (Diversion mechanism; control systems.)

**EXHIBIT 20:** Commission reconstruction and damages schedule summarizing diverted commissions, itemizing approximately $5.6 million in allegedly diverted commissions and projecting renewal losses. (To be submitted under seal with appropriate motion and order.) (Damages model; traceability; litigation summary.)

**EXHIBITS 20A–20E:** Plaintiff's insurance carrier contracts terminated by Enterprise members. This schedule summarizes compensation traceable through carrier commission statements, Enterprise routing systems, and contractual commission schedules, the full details of which are within Defendants' possession, custody, or control.

## IV. MORTGAGE-PROTECTION FRAUD / MAIL FUNNEL MATERIALS (ENTERPRISE-WIDE)

**EXHIBIT 21:** Standardized "FINAL MORTGAGE NOTICE" or similar mailer(s) used by the enterprise. (Mail-funnel; consumer inducement.)

**EXHIBIT 22:** Mortgage-protection client handout(s) or consumer-facing collateral distributed through enterprise channels. (Consumer representations.)

**EXHIBIT 23:** Enterprise-approved mortgage-protection script(s) attributed to Defendant Leake and/or training directives. (Uniform misrepresentations; standardization.)

**EXHIBIT 24:** Mortgage-protection flyers provided to agents. (Uniform marketing; consumer inducement.)

**EXHIBIT 25:** KCRG-TV9 investigative report materials ("Disguised Mail") and supporting screenshots/transcript excerpts referenced. (Public notice; longstanding concern; publication corroboration.)

**EXHIBIT 25A:** Illinois Department of Financial and Professional Regulation (IDFPR), Division of Banking, **Order to Cease and Desist dated June 8, 2016**, directed to Symmetry Financial Group, LLC (or affiliated entity), concerning mortgage-related solicitation materials and use of bank-name or lender-implied marketing formats. (Public regulatory order; notice, knowledge, and continuity evidence.)

## V.    ADVANCED MARKETS TRAINING / SUITABILITY AND SOLVENCY MANIPULATION

**EXHIBIT 26:** Advanced Markets presentation slides and related training materials (selected excerpts). (Training content; suitability/control context.)

**EXHIBIT 27:** Forensic accountancy report identifying low-solvency carrier exposures and risk indicators (if used). (To be submitted under seal with appropriate motion and order.) (Risk methodology; suitability concerns.)

**EXHIBIT 28:** Forensic accountancy report identifying high-solvency carriers withheld and related opportunity deprivation (if used). (To be submitted under seal with appropriate motion and order.) (Withholding; lost earning capacity.)

## VI.    RETALIATION, OBSTRUCTION, AND CONSCIOUSNESS OF WRONGDOING

**EXHIBIT 29:** Cell-phone video and/or recording of founder Brandon Ellison discussing role of General Counsel "keeps our [a*s] out of trouble" and related context. (To be submitted under seal with appropriate motion and order.) (State of mind; enterprise awareness.)

**EXHIBIT 30:** Social-media posts and images depicting Defendants and enterprise leadership participating in an Enterprise-sponsored Mexico event on or around June 27, 2025, including the timestamped resort image showing Defendants McManamon, Kyle Kimbrell, Leake, Lisa Kimbrell, and Smith-Simonds together, and related contextual metadata. (Timing; credibility;

pretext; consciousness of wrongdoing.)

**EXHIBIT 30A:** Screenshot of June 19, 2025 text message from Defendant Kyle Kimbrell to Plaintiff ("Lisa and I are for you… I'll be in touch") and any associated thread context. (Knowledge; inducement to delay escalation; credibility; pretext.)

**EXHIBIT 30B:** Photograph taken on or about May 29, 2025, in Orlando, Florida, during an Enterprise dinner attended by agents and leadership, depicting Plaintiff Witherell together with Defendant Tim Taylor Smith, Defendant Kyle Kimbrell, Barry Taylor of Quility Financial Advisors, and other Enterprise personnel. The photograph is offered solely to document Enterprise acknowledgment of the "MACK" client engagement and Plaintiff's role in originating and developing that relationship, and not for the truth of any celebratory or promotional statements depicted.

**EXHIBIT 31:** Internal directives, messages, or platform screenshots reflecting lockouts, carrier cancellations, removals from calendars/channels, and other retaliatory restrictions. (To be submitted under seal with appropriate motion and order.) (Retaliation mechanics; interstate systems.)

**EXHIBIT 31A:** Screenshot Enterprise-utilized social media platform images: Plaintiff's son removed by Defendant Brett Beaudry. (To be submitted under seal with appropriate motion and order.)

**EXHIBIT 31B:** Text message screenshot image from Plaintiff's son to Plaintiff: Confused, not knowing why he was removed. (To be submitted under seal with appropriate motion and order.)

**EXHIBIT 31C:** Screenshot Enterprise-utilized social media platform images: Reflecting Plaintiff removed by Defendants' Beaudry and Leake.

**EXHIBIT 31D:** Recorded telephonic communications involving Defendant Chris Leake

124

reflecting Enterprise-approved scripting, compensation discussions, and post-escalation conduct. (To be submitted under seal with appropriate motion and order.)

**EXHIBIT 31E:** San Antonio Police Department Report (SAPD Report No. 2511\*\*\*\*) documenting the June 1, 2025 stolen-luggage incident involving Plaintiff Witherell during Advanced Markets Bootcamp travel. (Category: contemporaneous incident documentation; travel/retaliation context if applicable. To be submitted under seal with appropriate motion and order.)

## VII.   CULTURE AND CONTROL EVIDENCE

**EXHIBIT 32:** Corporate "Core Values" document(s) and internal culture materials. (Contrast; knowledge; admissions by standard.)

**EXHIBIT 33:** Photograph(s) of Defendant Chris Leake and/or other Enterprise leadership at corporate events used to show Enterprise culture and expected participation. (Culture; context.)

## VIII.  PLAINTIFF'S REGULATORY SUBMISSIONS

**EXHIBIT 34:** SEC TCR submission (Tip, Complaint, or Referral) and supporting materials. (To be submitted under seal with appropriate motion and order.)

**EXHIBIT 35:** SEC whistleblower affidavit/declaration and supporting materials. (To be submitted under seal with appropriate motion and order.)

**EXHIBIT 36:** FINRA regulatory complaint submission and supporting materials. (To be submitted under seal with appropriate motion and order.)

**EXHIBIT 37:** IRS whistleblower submission packet (including forms and supporting documentation). (To be submitted under seal with appropriate motion and order.)

**EXHIBIT 38:** Federal Trade Commission (FTC) complaint submission and supporting materials. (To be submitted under seal with appropriate motion and order.)

**EXHIBIT 39:** EEOC charge/complaint materials and supporting documentation. (To be submitted under seal with appropriate motion and order.)

**EXHIBIT 40:** Arkansas Insurance Department complaint submission and supporting materials. (To be submitted under seal with appropriate motion and order.)

**EXHIBIT 41:** Alaska Department of Commerce, Community, and Economic Development – Securities complaint submission and supporting materials. (To be submitted under seal with appropriate motion and order.)

**EXHIBIT 42:** Louisiana Office of Financial Institutions complaint submission and supporting materials. (To be submitted under seal with appropriate motion and order.)

**EXHIBIT 43:** Louisiana Department of Insurance complaint submission and supporting materials. (To be submitted under seal with appropriate motion and order.)

**EXHIBIT 44:** Florida Office of Financial Regulation – Securities complaint submission and supporting materials. (To be submitted under seal with appropriate motion and order.)

**EXHIBIT 45:** California Department of Financial Protection and Innovation (DFPI) complaint submission and supporting materials. (To be submitted under seal with appropriate motion and order.)

**EXHIBIT 46:** NAIC consumer/referral submission to Commissioners (or NAIC-routed complaint) and supporting materials. (To be submitted under seal with appropriate motion and order.)

## IX. CONSOLIDATED INDEX / RECORD LOCATOR

**EXHIBIT 47:** Plaintiff's Consolidated Evidence Index (record-locator mapping: paragraph → exhibit → recording/time-stamp → custodian/source). Filed under seal.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable. To the extent Defendants contend that any contractual provision purports to waive the right to jury trial, Plaintiff disputes the enforceability and applicability of any such provision as to the statutory, tort, racketeering, and whistleblower claims asserted herein, and preserves all rights accordingly.

Respectfully submitted this 5th day of March, 2026.



_____

Walter David Witherell II
Plaintiff, Pro Se,
P.O. Box 310559, New Braunfels, TX, 78130
Telephone: 830-327-9205 / Email: NestEggPresident@proton.me

## CERTIFICATION

I certify under penalty of perjury that the foregoing allegations are true and correct to the best of my knowledge, information, and belief, formed after reasonable inquiry and that this Complaint is submitted in good faith pursuant to Fed. R. Civ. P. 11. Plaintiff has reviewed the factual allegations and legal claims herein with reference to applicable statutes and controlling precedent and believes them to be well grounded in fact and law.

_____

Walter David Witherell II